2015 COA 107M

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Michael Lee MENDENHALL, Defendant–Appellant.**

**Court of Appeals No. 12CA1171**

Colorado Court of Appeals, Div. I.

Announced August 13, 2015

As Modified on Denial of Rehearing November 5, 2015

*Kazadi,* 284 P.3d 70, 73 (Colo. App. 2011), *aff'd,* 2012 CO 73, 291 P.3d 16.

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S. 2014.

Cynthia H. Coffman, Attorney General, Ethan E. Zweig, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Ryann S. Hardman, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by JUDGE BERGER

¶ 1. Defendant, Michael Lee Mendenhall, appeals the judgment of conviction entered on jury verdicts finding him guilty of securities fraud and theft.

¶ 2 One of the elements of securities fraud under the Colorado Securities Act (CSA) is that the defendant engaged in fraud in connection with a "security." § 11–51–501, C.R.S. 2014. If there is no security, there cannot be securities fraud. The CSA defines "security" to include "any note." § 11–51–201(17), C.R.S. 2014. The principal issue presented in this appeal is whether the trial court correctly instructed the jury that "any note" is a "security." Because we conclude that sometimes notes are not securities, we hold that the court's instruction constituted error, and we reverse defendant's securities fraud convictions.

¶ 3 We address defendant's remaining arguments as they pertain to his theft convictions and, to the extent the issues may recur on remand, with respect to the securities fraud charges. These arguments are: (1) the trial court admitted irrelevant testimony from an investigator for the district attor-

ney's office concerning the investigation of economic crimes generally, and the investigation that led to charges against defendant specifically; (2) the prosecutor engaged in prosecutorial misconduct in closing argument when he compared defendant to Bernie Madoff and called the victims members of the "greatest generation"; (3) the cumulative effect of the allegedly irrelevant testimony and the prosecutorial misconduct requires reversal; and (4) a remand is necessary because there is a discrepancy between the court's oral statements regarding the length of the aggregate sentence imposed and the mittimus.

¶ 4 While we agree with defendant that the trial court erred in a number of respects, we conclude that none of the errors, other than the erroneous instruction on the definition of security, requires reversal. Accordingly, we affirm defendant's theft convictions. Because we cannot discern what sentence the trial court intended to impose for the theft convictions alone due to the inconsistencies between the mittimus and the oral pronouncement of defendant's aggregate sentence, we vacate defendant's sentence in its entirety. We remand for a new trial on the securities fraud charges and for resentencing on the theft convictions.

## I. Relevant Facts and Procedural Background

¶ 5 Defendant was employed as a salesperson by an insurance company that specializes in low risk insurance products for retirement-age persons. Defendant also was licensed to sell securities through an affiliated broker-dealer. Through his employment, defendant met the victims, who were his customers or clients at the insurance company and the affiliated broker-dealer.

¶ 6 In 1999, defendant purchased a townhouse in a new development in Denver. During the early years of his ownership, the value of the townhouse increased significantly, persuading defendant to purchase additional units for investment in the same development. It appears that the additional units were purchased through money borrowed both against the original unit and the additional units.

¶ 7 When the rental income from the investment properties was insufficient to pay the mortgages and other carrying costs, defendant initially used his various lines of credit to cover the difference. But soon, the credit lines were exhausted and defendant began his criminal conduct. He asked his insurance company clients (without the knowledge or consent of the company and in violation of the company's rules) to "loan" him money. To induce his clients to give him this money (which ultimately totaled more than $1 million), he promised them a higher interest rate than was available on legitimate investments through the insurance company (or otherwise).

¶ 8 Defendant gave each victim a document entitled "promissory note" or "note." The basic terms of the notes were similar, stating the amount of money given to defendant, when the note was due, and the interest rate. The notes stated that the money was "for the purpose of [defendant's] recent residential real estate acquisitions [in the development]" and that the notes were purportedly secured by the equity defendant held in all four properties. But the collateral was worthless because defendant had no equity in the properties, a material fact that he neglected to disclose to his victims.

¶ 9 He also provided his victims with selective information on the townhouse development, much of which was misleading or incomplete. To at least some of the victims, he represented that there was no risk in these "loans." Defendant likewise did not disclose to his victims that he was using the victims' money for his personal living expenses and sometimes to pay the interest due on other victims' notes.

¶ 10 Not surprisingly, defendant failed to pay the notes when they came due. He convinced some victims to extend the terms of their notes, but he still did not pay the notes when they again came due. On occasion, he did pay some or all of the interest owed on a note, using monies from new or prior victims.

¶ 11 After defendant's actions came to light, he was indicted on twenty-seven felony counts, including seventeen counts of securi-

ties fraud (untrue statement or omission), in violation of section 11–51–501(1)(b); one count of securities fraud (fraud or deceit), in violation of section 11–51–501(1)(c); one count of theft of $15,000 or more, in violation of section 18–4–401(1)(b), (2)(g), C.R.S.2014; one count of theft of $20,000 or more, in violation of section 18–4–401(1)(b), (2)(h); two counts of theft (series of $15,000 or more), in violation of section 18–4–401(1)(b), (4); and five counts of theft (series of $20,000 or more), in violation of section 18–4401(1)(b), (4).

¶ 12 A jury convicted defendant on all of the counts presented to it (one count of securities fraud and one count of theft were dismissed by the prosecution). The court imposed a lengthy prison sentence, the exact length of which is unclear, but which the parties agree ranges from twenty-five to thirty-five years.

## II. Jury Instruction on the Definition of a Security

¶ 13 Defendant argues that not all notes are securities and that therefore the trial court erred in instructing the jury that "security means any note." We agree.

¶ 14 A trial court must correctly instruct the jury on all matters of law applicable to the case. *People v. Lucas*, 232 P.3d 155, 162 (Colo. App. 2009); *People v. Pahl*, 169 P.3d 169, 183 (Colo. App. 2006). "We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law." *Lucas*, 232 P.3d at 162.

¶ 15 The jury was instructed on the elements of securities fraud, which included the element that defendant's fraudulent acts, statements, or omissions occurred "in connection with the offer or sale of any *security*." (Emphasis added.) "Security" was defined as, among other things, "any note ..., investment contract, ... or, in general, any interest or instrument commonly known as a 'security.'" The term "note" was not further defined, but "investment contract" was defined as "an investment of money, in a common enterprise, with the expectation of a profit, based upon the essential managerial efforts of the promoter or a third party."

¶ 16 Defense counsel requested an additional jury instruction that "a note is not always a security," in reliance on the United States Supreme Court's decision in *Reves v. Ernst & Young*, 494 U.S. 56, 62–63, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). In *Reves,* the Court held that the phrase "any note" in the federal Securities Exchange Act of 1934 (1934 Act) "should not be interpreted to mean literally 'any note'' because not all notes are securities. *Id.* Defense counsel argued that without the supplemental instruction, the definition of security in the jury instructions, although correct as far as it went, was incomplete. The trial court declined to modify the definitional instruction or give any additional instructions, but permitted defense counsel to argue in closing that context needs to be taken into account in determining whether a particular note is a security.

### A. The Error Was Preserved

¶ 17 Citing the contemporaneous objection rule, *see People v. Douglas*, 2012 COA 57, ¶ 59, 296 P.3d 234, the People argue that, by agreeing that the definition of security was correct, defense counsel approved or accepted the trial court's definitional instruction, thus precluding any review other than for plain error. The People's narrow reading of the record is unwarranted.

¶ 18 "The purpose of the contemporaneous objection rule is to ... alert[ ] the trial court to a particular issue in order to give the court an opportunity to correct any error" and "put the trial court on notice of [the party's] position." *Pahl*, 169 P.3d at 183. Read reasonably, the record establishes that defense counsel informed the court that the definition of note, although correctly phrased in the language of the statute, did not accurately reflect the law without additional instruction. This was sufficient to provide the court with the opportunity to consider defendant's position and decide whether to take any action in response.

¶ 19 Alternatively, the People argue that defendant did not preserve the error because he did not tender a proposed written instruc-

tion. The People rely on Crim. P. 30, which states:

> A party who desires instructions shall tender his [or her] proposed instructions to the court.... All instructions shall be submitted to the parties, who shall make all objections thereto before they are given to the jury. Only the grounds so specified shall be considered ... on review.... All instructions offered by the parties, or given by the court, shall be filed with the clerk and, with the endorsement thereon indicating the action of the court, shall be taken as a part of the record of the case.

¶ 20 However, nothing in the plain language of Crim. P. 30 requires the tender of a proposed written instruction to preserve a contention of instructional error. Nor do the People cite any Colorado case that has construed Crim. P. 30 to require, under the circumstances presented here, both an objection to the instruction given by the trial court *and* a tender of a written instruction.

¶ 21 Rather, contentions of instructional error are preserved when a party objects to an instruction or requests a specific additional or alternative instruction. *See, e.g., People v. Coughlin,* 304 P.3d 575, 585 (Colo. App. 2011); *People v. Taylor,* 230 P.3d 1227, 1230 (Colo. App. 2009), *overruled on other grounds by People v. Pickering,* 276 P.3d 553 (Colo. 2011); *People v. Lara,* 224 P.3d 388, 394 n.3 (Colo. App. 2009), *overruled on other grounds by Pickering,* 276 P.3d 553.

¶ 22 Defense counsel's stated concern that the trial court's definitional instruction was incomplete, coupled with his request for an instruction expressly stating that not all notes are securities, was sufficient to preserve the error for appellate review.

### B. The Definitional Instruction Was Erroneous

¶ 23 The more difficult question is whether the definitional instruction was erroneous. The definition of security in the instructions was based on the statutory definition of "security" in section 11–51–201(17) of the CSA.

¶ 24 Definitional jury instructions that accurately track the language of the applicable statute are generally proper and sufficient. *People v. Houser,* 2013 COA 11, ¶ 76, 337 P.3d 1238; *People v. Zukowski,* 260 P.3d 339, 343 (Colo. App. 2010). It is the legislature's prerogative to define criminal offenses; absent constitutional constraints, which are not implicated here, it is not the proper function of a court to limit the reach of a criminal statute because the court thinks the statute reaches too broadly. *See People v. Manzo,* 144 P.3d 551, 554 (Colo. 2006). Nevertheless, if a statutory definition does not adequately inform the jury of the governing law, additional instructions are required. *See Bustamonte v. People,* 157 Colo. 146, 151–52, 401 P.2d 597, 600 (1965); *Leonard v. People,* 149 Colo. 360, 374, 369 P.2d 54, 62 (1962); *People v. James,* 40 P.3d 36, 46 (Colo. App. 2001); *People v. Silva,* 987 P.2d 909, 917 (Colo. App. 1999).

¶ 25 The General Assembly has directed courts to consider the context when applying the statutory definitions in the CSA. Section 11–51–201 provides that the statutory definitions (including the definition of "security" as "any note") must be applied *"unless the context otherwise requires."* (Emphasis added.) The term "context" in the statutory phrase "unless the context otherwise requires" means the context "within which [a defined statutory term] is used within the statute's substantive provisions." *Pima Fin. Serv. Corp. v. Selby,* 820 P.2d 1124, 1128 (Colo. App. 1991). "[C]ontext refers ... to pertinent statutory language—the text of the [statute containing the word at issue] and related statutes." *Dep't of Transp. v. City of Idaho Springs,* 192 P.3d 490, 493 (Colo. App. 2008).

¶ 26 The General Assembly has also prescribed that the provisions of the CSA "shall be coordinated with the federal acts and statutes to which references are made in this article [including the 1934 Act] ... to the extent coordination is consistent with both the purposes and the provisions of this article." § 11–51–101(3), C.R.S. 2014. Accordingly, "insofar as the provisions and purposes of [Colorado's] statute parallel those of the federal enactments," federal precedent interpreting those enactments is highly persuasive. *Cagle v. Mathers Family Trust,* 2013

CO 7, ¶ 19, 295 P.3d 460 (internal quotation marks omitted).

¶ 27 The 1934 Act, which prohibits securities fraud, also defines "security" to include "any note." 15 U.S.C. § 78c(a)(10) (2012); *see also* 15 U.S.C. § 78j(b) (2012) (proscribing fraud "in connection with the purchase or sale of any security" in interstate commerce). In interpreting this provision, the United States Supreme Court has explained that the phrase "unless the context otherwise requires," which precedes the federal statutory definition of "security," means that "an instrument which seems to fall within the broad sweep of the Act is not to be considered a security if the context otherwise requires." *Marine Bank v. Weaver*, 455 U.S. 551, 558, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). Rather, statutory terms like "any note" "must be understood against the backdrop of what Congress was attempting to accomplish in enacting the Securities Acts." *Reves*, 494 U.S. at 63, 110 S.Ct. 945.

¶ 28 Congress "did not intend to provide a broad federal remedy for all fraud" in enacting the securities laws. *Marine Bank*, 455 U.S. at 556, 102 S.Ct. 1220. Instead, "[t]he fundamental purpose undergirding the Securities Acts is to eliminate serious abuses in a largely unregulated securities market." *Reves*, 494 U.S. at 60, 110 S.Ct. 945 (internal quotation marks omitted). Similarly, the purpose of the CSA is "to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." § 11–51–101(2).

¶ 29 Thus, under both the federal and state securities statutes, courts must decide "which of the myriad financial transactions in our society come within the coverage of [the securities fraud] statutes" in order to effectuate the purposes of the acts: regulating investments and protecting investors. *Reves*, 494 U.S. at 61, 110 S.Ct. 945 (internal quotation marks omitted).

¶ 30 To determine which financial transactions fall under the securities fraud statutes, "[courts] are not bound by legal formalisms, but instead take account of the economics of the transaction under investiga-

tion." *Id.*; *see also Cagle*, ¶ 19 ("The hallmark of both state and federal securities regulation is that courts pay close attention to the facts of each case and the commercial realities of each securities offering." (internal quotation marks omitted)).

¶ 31 In concluding that "the phrase 'any note' should not be interpreted to mean literally 'any note,'" the Court in *Reves*, 494 U.S. at 62–63, 110 S.Ct. 945, explained that a note (unlike other instruments such as stock) is not the kind of instrument that is an investment by its inherent nature. Rather, "note" is "a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context." *Id.* at 62, 110 S.Ct. 945 (internal quotation marks omitted). Thus, not all notes involve investments or constitute securities. *Id.*

¶ 32 The Court devised a multi-pronged test to define the phrase "any note," as that term is understood under the securities laws. *Id.* at 63–66, 110 S.Ct. 945. Under that test, "[a] note is [initially] presumed to be a 'security,'" but "that presumption may be rebutted ... by a showing that the note bears a strong resemblance ... to one of the [Court's] enumerated categories of instrument" that are commonly denominated notes but nonetheless are not securities. *Id.* at 65–67, 110 S.Ct. 945.

¶ 33 These instruments include notes delivered in consumer financing; notes secured by a mortgage on a home; short-term notes secured by a lien on a small business or some of its assets; notes evidencing a "character" loan to a bank customer; short-term notes secured by an assignment of accounts receivable; notes which simply formalize an open-account debt incurred in the ordinary course of business; and notes evidencing loans by commercial banks for current operations. *See id.* at 65, 110 S.Ct. 945 (citing *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984), and *Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976)).

¶ 34 To determine whether a note bears a strong, or a "family" resem-

blance, to one of the items on this list, four factors should be considered. *Id.* at 67, 110 S.Ct. 945.

First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." Second, we examine the "plan of distribution" of the instrument to determine whether it is an instrument in which there is "common trading for speculation or investment." Third, we examine the reasonable expectations of the investing public.... [Fourth], we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Id.* at 66–67, 110 S.Ct. 945 (citations omitted). If an instrument denominated a "note" is not sufficiently similar to an item on the list in light of these four factors, the same four factors should be examined to determine whether the instrument is nonetheless not a security. *See id.* at 67, 110 S.Ct. 945.

¶ 35 In *United States v. McKye*, 734 F.3d 1104, 1110 (10th Cir. 2013), the Tenth Circuit relied on *Reves* to hold that, in a criminal prosecution for federal securities fraud, the district court erred in instructing the jury that the definition of security "include[s] ... a note." The Tenth Circuit concluded that the instruction was erroneous because it permitted the jury to convict the defendant without the necessity of the Government proving the notes at issue in the case were securities. *See id.* at 1107.

¶ 36 The existence of a security is an element of the crime of securities fraud. *Id.* at 1109. The Constitution demands that every element of a criminal offense be proved beyond a reasonable doubt, and that this determination must be made by a jury, not by a court in a jury instruction. *See id.* "[W]hether a note is a security is a mixed question of fact and law with the jury finding certain predicate facts and then applying those facts to the correct legal standard." *Id.* Accordingly, a jury instruction in a criminal securities fraud case may not constitutionally relieve the prosecution of its burden to prove beyond a reasonable doubt that the instrument at issue is a security. *See id.* at 1110; *see also State v. McGuire*, 302 Wis.2d 688, 735 N.W.2d 555, 565 (Wis. Ct. App. 2007).

¶ 37 Given the similar purposes of the 1934 Act and the CSA and the identical definition of "security" as "any note," we hold that the test established by the Court in *Reves* to determine when a note is a security under the federal securities laws is equally applicable to determine when a note is a security under the CSA. Although the CSA defines "security" as "any note," § 11–51–201(17), the securities fraud statute requires that fraud must be perpetrated in connection with the offer, sale, or purchase of any *security*, § 11–51–501(1). Accordingly, if the prosecution in a criminal securities case relies on the theory that the relevant instrument is a note, the jury must be instructed that not all notes are securities. The jury must further be instructed, using the test from *Reves*, how to determine if the note is a security.[1]

---

1. We acknowledge the difficulties inherent in instructing a jury on such complex and multifarious factors. But we believe that the Court's test from *Reves* best encapsulates the legislative intent in defining "security" to include "any note," and that a less comprehensive test would be deficient given that the Constitution requires the jury to determine that the instrument at issue is a security before rendering a conviction for securities fraud based upon a note. For the convenience of the trial court on remand, two versions of a jury instruction devised from the *Reves* test are attached as an appendix to this decision. Because the issue is not before us, we express no opinion on the sufficiency of these examples. If the issue arises, the court has discretion in how it instructs the jury, consistent with this decision.

¶ 38 We conclude that, like in *McKye*, the instruction here that a security is "any note" relieved the prosecution of its burden to establish an element of the offense of securities fraud under section 11–51–501.

¶ 39 Defendant's principal defense to the securities charges was that the notes he gave his victims evidenced ordinary personal loans and thus did not constitute securities.[2] While the evidence presented at trial by the prosecution amply disputed this defense, in a criminal case, no matter how one-sided the evidence may be, the trial court may not deny the defendant his or her constitutional right to have a jury determine, beyond a reasonable doubt, every element of the crime with which he or she is charged. *See, e.g., Medina v. People*, 163 P.3d 1136, 1140 (Colo. 2007).

¶ 40 By instructing the jury that a note is a security, the trial court permitted, indeed compelled, the jury to determine that the instruments were securities merely by finding that they were notes. As a result, the court committed constitutional error by failing to provide a complete and accurate definition of the term "note," thereby denying defendant his right to a jury determination that the notes at issue were securities.

### C. The Instructional Error Requires Reversal of Defendant's Securities Fraud Convictions

¶ 41 "[W]hen a trial court misinstructs the jury on an element of an offense, either by omitting or misdescribing that element, that error is subject to constitutional harmless or plain error analysis...." *Griego v. People*, 19 P.3d 1, 8 (Colo. 2001). Because defendant preserved this error, we review for constitutional harmless error. *Hagos v. People*, 2012 CO 63, ¶ 11, 288 P.3d 116.

¶ 42 We must reverse defendant's securities fraud convictions unless we are "able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Id.* (internal quotation marks omitted). An error is not harmless beyond a reasonable doubt if "there is a reasonable possibility that the error might have contributed to the conviction." *People v. Carter*, 2015 COA 36, ¶ 47, —— P.3d ——. The People bear the burden of proving that the error was harmless beyond a reasonable doubt. *Hagos*, ¶ 11.

¶ 43 We reject the People's argument that the error did not prejudice defendant because the jury was instructed that the definition of "security" included investment contracts, and the evidence was overwhelming that the instruments at issue were investment contracts. The prosecution did not limit its case to proving that the instruments were investment contracts; rather, the prosecution also argued that the instruments were notes.

¶ 44 The circumstances here—jury instructions that provide a "legally inadequate basis of liability"—are distinguishable from cases in which jury instructions "merely provide a factually inadequate basis of liability," which the Colorado Supreme Court has held do not violate due process. *People v. Dunaway*, 88 P.3d 619, 629 (Colo. 2004) (citing *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)).

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law .... When, therefore, jurors have been left the opinion of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the opinion of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.

*Griffin*, 502 U.S. at 59, 112 S.Ct. 466.

¶ 45 Thus, in *Dunaway*, the supreme court held that "when a jury instruction in-

---

2. This case is thus distinguishable from *Ascher v. Commonwealth*, 12 Va.App. 1105, 408 S.E.2d 906, 916–17 (1991), in which the Virginia Court of Appeals concluded that an instruction in a securities fraud case that "[t]he term 'security' means any note" was adequate because "there was no theory or basis which would have permit-ted the fact finder to conclude that the notes or evidence of indebtedness [at issue] were not securities." Here, however, defendant's testimony that the notes evidenced personal loans, not securities transactions, required an instruction defining when a note is not a security. *Cf. id.* at 916.

cludes two alternative factual theories of the same charged offense and the jury returns a general verdict of guilt," if one theory was supported by sufficient evidence, reversal is not required merely because the other theory was not. 88 P.3d at 622, 631. But in doing so, the supreme court recognized the rule that "due process will not sustain a jury instruction containing a legally (not factually) erroneous theory of liability." *Id.* at 630. Consequently, "a reviewing court may appropriately negate a verdict where a defendant is convicted on a legally inadequate basis of liability, even where the jury is instructed on more than one theory of liability." *People v. Mantos*, 250 P.3d 586, 590-91 (Colo. App. 2009) (citing *Griffin*, 502 U.S. at 59, 112 S.Ct. 466).

¶ 46 Accordingly, "[w]hen there is legal error as to one basis for finding an element, the submission of an alternative theory for making that finding cannot sustain the verdict unless it is possible to determine the verdict rested on the valid ground." *McKye*, 734 F.3d at 1110 n.6 (internal quotation marks omitted); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 58, 129 S.Ct. 530, 172 L.Ed.2d 388 (2008) ("A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on a[ ] [legally] invalid one."); *Dunaway*, 88 P.3d at 629-31 (Colo. 2004).

¶ 47 Because the general verdict here makes it impossible to determine whether the jury convicted defendant of securities fraud because it found that the instruments were investment contracts or because it found that they were notes (or both), the People "must show harmlessness as to

the erroneously instructed ground considered separately." *McKye*, 734 F.3d at 1110 n. 6 (internal quotation marks omitted); *see also Hedgpeth*, 555 U.S. at 58, 62, 129 S.Ct. 530 (When a jury is instructed on multiple theories of guilt, one of which is improper, a reviewing court must determine "whether the flaw in the instructions had substantial and injurious effect or influence in determining the jury's verdict." (internal quotation marks omitted)).[3]

¶ 48 We also reject the People's argument that defendant was not prejudiced by the error because he had an opportunity to argue in closing that not all notes are securities, and expert testimony was presented to the jury to that effect as well. Argument by counsel, and even the presentation of expert testimony, is not equivalent to a proper jury instruction, particularly when, as here, an elemental instruction appears to *require* rejection of the argument and expert testimony.

¶ 49 We conclude that the People have not met their heavy burden to prove that the instructional error was harmless beyond a reasonable doubt. Whether the instruments at issue were securities was disputed at trial. Although a substantial amount of the evidence indicated that the instruments were securities, the instructional error permitted the jury to make such a finding merely by concluding that the instruments were notes. Under the constitutional harmless error standard, "[t]he inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Blecha v. Peo-*

---

3. In *Crespin v. People*, 721 P.2d 688, 691-92 (Colo. 1986), the Colorado Supreme Court held that "[w]hen ... a case is submitted to the jury under a general verdict on alternative theories of criminal liability, one of which is unconstitutional, and a general guilty verdict is returned, it is virtually impossible for a reviewing court to determine with any degree of certainty the precise legal theory on which the verdict was based, with the result that the constitutional error in submitting the case to the jury in that form cannot be deemed harmless and the conviction must be set aside." However, the instructional error here is not equivalent to the submission of "a constitu-

tionally invalid crime to the jury," *id.* at 691, because the error was not the consequence of an unconstitutional statute nor did it result in a conviction for constitutionally protected conduct. Rather, a defendant may constitutionally be convicted under section 11–51–501, C.R.S. 2014, for fraud "in connection with the offer, sale, or purchase" of any note as long as the note at issue constitutes a security. Accordingly, like other instructional errors that omit or misdescribe an element of the offense, we review the error for constitutional harmless error. *See Griego v. People*, 19 P.3d 1, 8 (Colo. 2001).

*ple*, 962 P.2d 931, 942 (Colo. 1998) (internal quotation marks omitted). Under the circumstances, we cannot conclude that the jury's verdict was "surely unattributable" to the error.

¶ 50 The concurrence in *McKye* notes that circuit courts have applied different tests in determining whether reversal is required "when a defendant is convicted under jury instructions that contained alternative grounds for conviction, one of which was [legally] improper." *United States v. McKye*, 734 F.3d 1104, 1112–13 (10th Cir. 2013) (Briscoe, C.J., concurring). For instance, the Fourth Circuit will affirm " '[i]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground.' " *Id.* at 1113 (quoting *Bereano v. United States*, 706 F.3d 568, 578 (4th Cir. 2013)). And the Ninth Circuit asks whether "it can discern with 'reasonable probability' that the jury convicted the defendant on the alternate, but valid, ground." *Id.* (quoting *Babb v. Lazowsky*, 719 F.3d 1019, 1034–35 (9th Cir.2013)).

¶ 51 Under any such test, however, the People cannot establish that defendant's conviction rested on the investment contract theory rather than the note theory, or that the jury necessarily made the findings required to support a conviction on the valid ground. Rather, the jury could have determined that the instruments at issue were notes, and thus under the erroneous instruction, securities, without ever considering or making any findings regarding the investment contract theory. Consequently, the People cannot prove beyond a reasonable doubt that the error, which had the effect of virtually directing a guilty verdict against defendant, was harmless.

¶ 52 Accordingly, the instructional error was not harmless beyond a reasonable doubt and requires reversal of defendant's securities fraud convictions.

### III. Other Contentions of Error

¶ 53 We address defendant's other arguments because they also apply to his theft convictions, which are not affected by the reversal of his securities fraud convictions. Our analysis of these arguments is also relevant to the extent that any of the following issues could recur on remand in a new trial on the securities fraud charges.

### A. Relevance of Investigator's Testimony

¶ 54 Defendant argues that the trial court erred in admitting the district attorney's investigator's testimony regarding his process for investigating someone suspected of criminal activity, under what circumstances he recommended pursuing criminal charges, and the specific investigation of, and decision to pursue charges against, defendant. We agree that some of the testimony was admitted in error, but we conclude that the error was harmless.

¶ 55 The investigator testified that he normally received the cases that he investigated through "referrals" from various entities and individuals. The prosecutor asked him how many referrals he received on average in a given twelve-month period, to which defense counsel objected on relevancy grounds. The trial court overruled the objection. The investigator responded that he received 250 to 500 referrals per year and described the process he undertook after he received a referral, which included how he decided whether, and to what extent, he would investigate a case.

¶ 56 In response to a series of questions by the prosecutor, the investigator testified that not all referrals resulted in the filing of criminal charges because "[t]here are times when a criminal filing is not appropriate. It doesn't fall under the statute that [he] primarily work[ed] under or statutes that [he] worked under." The prosecutor then asked the investigator how many of the 250 to 500 referrals resulted in criminal charges, and defense counsel again objected as to relevance. The trial court also overruled that objection. The investigator testified that charges were filed in approximately thirty-five to fifty cases per year.

¶ 57 The investigator also testified about a referral he had received in 2008 regarding defendant. The investigator testified that he was contacted by a bank employee who was concerned about defendant's activities in relation to some of the bank's customers, some of whom were ultimately victims in this case. The investigator explained that he spoke to two of the victims and interviewed defendant, but that he did not proceed further with the investigation or recommend filing charges. He testified that he did not do so because the two victims did not want to file any type of complaint against defendant and, at that time, the notes had not yet become due so he did not have the evidence to pursue a criminal complaint.

¶ 58 The investigator testified that he received another referral regarding defendant in 2010. After interviewing all of the identified victims in this case, reviewing defendant's bank records, and conducting further investigation, he recommended that criminal charges should be brought against defendant.

¶ 59 Defendant argues on appeal that the investigator's testimony about his recommendation to pursue criminal charges against defendant and the number of cases he investigates and decides to charge each year was irrelevant and unfairly prejudicial.

¶ 60 We review a trial court's decision regarding the admissibility of evidence for an abuse of discretion. *People v. Jimenez*, 217 P.3d 841, 864 (Colo. App. 2008). A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, *People v. Ibarra*, 849 P.2d 33, 38 (Colo. 1993), or if it misconstrues or misapplies the law, *People v. Glover*, 2015 COA 16, ¶ 10, 363 P.3d 736.

¶ 61 Only relevant evidence is admissible. CRE 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. CRE 401. Evidence that is relevant nonetheless may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403.

¶ 62 When probable cause to charge a defendant is not at issue—and it was not at issue here—the prosecution's presentation of evidence about charging decisions may imply that, because of a pretrial screening process, only guilty parties are charged with crimes and thus the defendant must be guilty. *See Domingo–Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005); *People v. Mullins*, 104 P.3d 299, 301 (Colo. App. 2004); *People v. Jones*, 832 P.2d 1036, 1040 (Colo. App. 1991). Such references to a "screening process" are improper because they hint that additional evidence supporting guilt exists that is unknown to the jury, and also reveal the personal opinion of the witness as to the guilt of the defendant. *See Domingo–Gomez*, 125 P.3d at 1052. Moreover, the fact that the People believed that there was reason to bring charges against a defendant is irrelevant because that belief has no rational tendency, using permissible inferences, to make it more probable that the defendant committed the charged offense. *See Mullins*, 104 P.3d at 301.

¶ 63 We thus conclude that the investigator's statements regarding how many potential cases he received each year and in how many of those cases charges were brought constituted inadmissible evidence. We see no purpose for the testimony other than to imply that defendant was guilty because the prosecution believed it was "appropriate" to bring charges in this case whereas multiple other cases did not result in criminal charges. Consequently, the only inference that the jury could draw from the testimony—that the prosecution believed defendant was guilty—was improper. The testimony was therefore irrelevant and inadmissible.

¶ 64 The People argue, citing *People v. Davis*, 312 P.3d 193 (Colo. App. 2010), aff'd, 2013 CO 57, 310 P.3d 58, that defendant opened the door to questions about the investigation because defense counsel's opening statement intimated that the charges brought against defendant in 2010 were not based on any likelihood that he committed a crime, as demonstrated by the fact that the People did not pursue criminal charges when defendant's activities were first reported in 2008. Rather, according to defense counsel,

the reason defendant was charged in 2010 was because he became a whistleblower against his employer and his employer pressured the People to file charges against him.

¶ 65 In *Davis*, defense counsel's opening statement suggested that a key prosecution witness only implicated the defendant after the interviewing detective threatened the witness with prison and told her she would not see her children. *Id.* at 196–97. Counsel further questioned why the detective did not obtain phone records that would confirm or undermine the testimony of another key prosecution witness. *Id.* at 197. The prosecution elicited testimony from the detective explaining why she used those tactics during the interview and why the phone records were not obtained. *Id.* at 196–97.

¶ 66 The court held that the testimony elicited from the detective regarding the interview and the phone records, while normally impermissible because some of the detective's statements implied her belief as to the credibility of the witnesses, was admissible to correct any misleading impression created by defense counsel's opening statement. *Id.*; *see also Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008).

¶ 67 We agree with the People that the investigator's testimony regarding both the 2008 investigation and why charges were brought in 2010 was permissible because defense counsel's opening statement opened the door. However, defendant did not open the door to testimony on the investigation of financial crimes in general or how often charges are brought because of those investigations. Counsel's opening statement did not address the investigative process in general; rather, it focused on charges not being brought in 2008 and concerns with why charges were ultimately brought in 2010. The investigator's testimony on charging decisions in general and the number of cases that result in criminal charges was thus not necessary to potentially correct any misleading impression created by defense counsel's opening statement. Accordingly, as discussed above, that testimony was irrelevant and impermissible.

¶ 68 We reject the People's contention that defendant did not preserve this error because he failed to object to each of the prosecutor's questions or to the entirety of the investigator's testimony. Defendant's two objections were sufficient to preserve the error because they put the trial court on notice of his position that the investigator's testimony, as to the parts we have identified as impermissible, was irrelevant. *See Pahl*, 169 P.3d at 183. We thus review for harmless error. *People v. Delsordo*, 2014 COA 174, ¶ 7, —— P.3d ——. "An error in the admission of evidence is harmless if, viewed in light of the entire trial record, it did not substantially influence the verdict or affect the fairness of the trial proceedings." *Id.*

¶ 69 We conclude that the investigator's testimony was harmless. His statements on the number of referrals he received and how often charges were brought, and that charges were not brought if it was not "appropriate," were brief and constituted a small part of his testimony. The prosecutor did not reference the impermissible statements in closing argument or indicate that the fact that charges were brought only after the case was screened meant defendant was guilty.

¶ 70 Moreover, there was overwhelming evidence that defendant was guilty of theft. Victim after victim testified at trial that defendant did not pay the notes when they came due. The only evidence defendant presented at trial showing that he intended to pay the victims back was his own testimony, which the jury was entitled to, and clearly did, reject.[4] Additionally, the evidence established that defendant continued to solicit money from the victims even after any reasonable person in his position would have known that he would be unable to pay the notes. Also, the collateral securing the notes was worthless, as defendant had no equity in the properties he pledged as collateral, all facts well-known to him at the time.

---

4. This harmless error analysis does not apply to defendant's securities fraud convictions. The evidence establishing theft does not establish some of the elements of securities fraud, including, most importantly, whether the instruments at issue were in fact securities.

¶ 71 Accordingly, the trial court's error in admitting parts of the investigator's testimony did not substantially influence the verdict or affect the fairness of the trial proceedings and does not require reversal of defendant's theft convictions.

### B. Prosecutorial Misconduct

¶ 72 Defendant contends that the prosecutor committed misconduct in closing argument when he likened defendant to Bernie Madoff and referred to the victims as members of the "greatest generation." Defense counsel did not object to these statements at trial. We conclude that even if the statements were improper, they did not constitute plain error.

¶ 73 One victim in the case testified that after defendant had initially borrowed a substantial sum of money from the victim, defendant approached him about borrowing an additional sum. According to the victim, he said to defendant that "this really reminds [him] of a Madoff scheme," and defendant answered, "Mr. Madoff didn't need the money."

¶ 74 In closing argument, while discussing the individual victims, the prosecutor stated, "[a]nd then you remember [the victim] actually kind of jokingly said to the defendant, [i]t seems like a Madoff scheme to me, to which what did the defendant say? Well, Madoff didn't need the money."

¶ 75 The prosecutor also twice referred to the victims as members of the "greatest generation," which referred to how members of that generation lived through the Depression and World War II, and had worked hard their entire lives.[5]

¶ 76 We engage in a two-step analysis when reviewing a claim of prosecutorial misconduct, determining, first, whether the prosecutor's conduct was improper based on the totality of the circumstances, and, second, whether such actions warrant reversal. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). We evaluate claims of improper argument "in the context of the argument as a

whole and in light of the evidence before the jury." *People v. Samson*, 2012 COA 167, ¶ 30, 302 P.3d 311. Whether prosecutorial misconduct requires reversal depends on "the severity and frequency of the misconduct, any curative measures taken by the trial court to alleviate the misconduct, and the likelihood that the misconduct constituted a material factor leading to the defendant's conviction." *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010).

¶ 77 Because defendant did not object to the prosecutor's statements, we review for plain error. *Id.* at 1152. Plain error is error that is obvious and substantial. *People v. Estes*, 2012 COA 41, ¶ 19, 296 P.3d 189. Error under a plain error standard of review requires reversal "only when there is a substantial likelihood that it affected the verdict or that it deprived the defendant of a fair and impartial trial." *Strock*, 252 P.3d at 1153. Thus, "[t]o constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at 1152 (internal quotation marks omitted).

¶ 78 Prosecutors may not make arguments "calculated to inflame the passions or prejudice of the jury." *People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999). However, a prosecutor may "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance." *People v. Allee*, 77 P.3d 831, 837 (Colo. App. 2003). Such rhetoric is only improper if it "induce[s] the jury to determine guilt on the basis of passion or prejudice, inject[s] irrelevant issues into the case, or accomplish[es] some other improper purpose." *Strock*, 252 P.3d at 1153.

¶ 79 The victim's testimony that defendant's conduct sounded like a "Madoff scheme" was relevant and properly admitted because it directly recounted the victim's recollection of a conversation that the victim had with defendant in connection with one of the

---

**5.** The term "The Greatest Generation" was coined by Tom Brokaw in his 1998 book of the same name. *See* Michael Lind, *The Class of '45,*

N.Y. Times, Dec. 27, 1998, http://perma.cc/535Z-6G2D.

"loans" at issue in the case. *See* CRE 401. The prosecutor's statement that referenced Madoff and Madoff schemes occurred during a summary of that testimony. Accordingly, even if the prosecutor's statement was somehow improper, it was not obvious error: the statement could have been interpreted as merely a synopsis of the victim's testimony rather than the prosecutor's own opinion that defendant was comparable to Madoff.

¶ 80 Regarding the prosecutor's references to the "greatest generation," even if we were to assume that they were improper, reversal is not required because they did not rise to the level of plain error.

¶ 81 First, the references to the "greatest generation" were brief. Second, the trial court instructed the jury that "neither sympathy nor prejudice" should influence its decision, and we must presume that the jury followed the court's instructions. *See People v. Castillo*, 2014 COA 140M, ¶ 35, —— P.3d ——. Finally, as discussed above, the evidence of defendant's guilt on the theft charges was overwhelming. For these reasons, we conclude that there is no substantial likelihood that the prosecutor's comments affected the verdict or deprived defendant of a fair and impartial trial.

### C. Cumulative Error

¶ 82 We reject defendant's argument that the cumulative effect of the investigator's irrelevant testimony and the prosecutor's improper statements requires reversal of defendant's theft convictions. Reversal is not required for cumulative error unless the cumulative effect of the errors shows that a defendant's right to a fair trial was substantially prejudiced. *People v. Conyac*, 2014 COA 8M, ¶ 151, 361 P.3d 1005. Given the nature of the errors we have identified and the overwhelming evidence of defendant's guilt regarding the theft charges, we cannot conclude that the cumulative effect of the errors substantially prejudiced defendant's right to a fair trial.

### IV. Correction of the Mittimus

¶ 83 Defendant contends, the People concede, and we agree that the mittimus is inconsistent with the trial court's oral sentencing ruling. Because we cannot discern from the record what sentence the trial court intended to impose for defendant's theft convictions apart from the sentence for securities fraud, we vacate defendant's sentence in its entirety and remand for resentencing on the theft convictions.

¶ 84 We review de novo whether the mittimus accurately reflects the sentence imposed at the sentencing hearing. *See People v. Rockne*, 2012 COA 198, ¶ 24, 315 P.3d 172. If the language of the mittimus is inconsistent with the sentencing court's oral ruling, it is proper to remand the case to correct the mittimus to reflect the court's ruling. *See People v. Young*, 894 P.2d 19, 20 (Colo. App. 1994).

¶ 85 There is a discrepancy between the sentences imposed on each count at the sentencing hearing, the trial court's statement regarding the total term of imprisonment, and the total term of imprisonment reflected in the mittimus. The individual sentences imposed at the hearing could total thirty or thirty-five years depending on whether counts 12 (for securities fraud) and 13 (for theft) were to be served concurrently or were consecutive five-year prison terms. The mittimus reflects a total term of thirty years in prison, but the court stated at the hearing that the total term of imprisonment was twenty-five years.

¶ 86 Because of these inconsistencies and our reversal of defendant's securities fraud convictions, we are unable to determine from the record what sentence the trial court intended to impose for defendant's theft convictions. Were we to vacate only the portion of the sentence imposed for defendant's securities fraud convictions, the length of the sentence remaining would not necessarily reflect the sentence the court intended to impose for the theft convictions. For this reason, we conclude that defendant's sentence must be vacated in its entirety and defendant resentenced on the theft convictions.

### V. Conclusion

¶ 87 Defendant's convictions for securities fraud are reversed, and the case is remanded for a new trial on the securities fraud

charges. In all other respects, the judgment of conviction is affirmed. Defendant's sentence is vacated, and the case is remanded for resentencing on the theft convictions.

JUDGE TAUBMAN and JUDGE HAWTHORNE concur.

### Attachment

### Appendix

### I.

¶ 88 In *State v. Kelson*, 345 P.3d 1136, 1137–38 (Utah 2014), the Utah Supreme Court upheld the following jury instruction, outlining the process for the jury to determine whether the promissory notes at issue were securities, "as an accurate statement of law":

> You are instructed that a "note" is presumed to be a security. However, certain notes have been classified as non-securities; these notes are:
>
> 1. the note delivered in consumer financing,
>
> 2. the note secured by a mortgage on a home,
>
> 3. the short-term note secured by a lien on a small business or some of its assets,
>
> 4. the note evidencing a "character" loan to a bank customer,
>
> 5. short term notes secured by an assignment of accounts receivable, or
>
> 6. a note which simply formalizes an open-account debt incurred in the ordinary course of business particularly if, as in the case of a customer of a broker, it is collateralized.
>
> A class of notes that resembles one of these exceptions can be added to the list of non-security notes if they meet a four factor test. That test is to:
>
> 1. examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." On the other hand, if the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, the note is less sensibly described as a "security."
>
> 2. [e]xamine the "plan of distribution" of the instrument to determine whether it is an instrument in which there is common trading for speculation or investment.
>
> 3. [e]xamine the reasonable expectations of the investing public, and
>
> 4. [e]xamine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*State v. Kelson*, 284 P.3d 695, 699 (Utah Ct. App. 2012), *rev'd on other grounds*, 345 P.3d 1136.

### II.

¶ 89 West's Federal Procedural Forms proposes the following jury instruction, "based on the analysis of notes in *Reves*":

> A note is presumed to be a "security," and that presumption may be rebutted only by a showing that the note is a note delivered in consumer financing, a note secured by a mortgage on a home, a short-term note secured by a lien on a small business or some of its assets, a note evidencing a "character" loan to a bank customer, a short-term note secured by an assignment of accounts receivable, a note that simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized), a note evidencing a loan by a commercial bank for current operations, or a note bearing a strong resemblance to any of the mentioned types of notes. In determining whether the note in this case bears a strong resemblance to a type of note not considered a "security," you should take into account:
>
> 1. The motivations that would prompt a reasonable seller and buyer to enter into the transaction evidenced by the note. If the seller's purpose was to raise money for the general use of a business enterprise or

to finance substantial investments and the buyer was interested primarily in the profit the note was expected to generate, the instrument is likely a "security." If the note was exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cashflow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." ·

2. The plan of distribution of the note. If the note was an instrument in which there was common trading for speculation or investment, it is more likely to be a "security."

3. The reasonable expectations of the investing public. You should consider the note in this case to be a "security" on the basis of such public expectations, even if an economic analysis of the circumstances of the particular transaction might suggest that the note is not a "security."

4. Factors, such as the existence of another regulatory scheme, that significantly reduce the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

14A Federal Procedural Forms: Proposed Jury Instruction—Note as "Security" § 59:426 (2015).