THE STATE OF NEVADA, APPELLANT, v. ROBERT MARCUS FRIEND, RESPONDENT.

No. 35363

February 15, 2002                                    40 P.3d 436

*Frankie Sue Del Papa,* Attorney General, and *Matthew S. Gabe,* Deputy Attorney General, Carson City; *Stewart L. Bell,* District Attorney, Clark County, for Appellant.

*Daniel J. Albregts, Ltd.,* Las Vegas, for Respondent.

*Joseph C. Long,* Norman, Oklahoma, for Amicus Curiae North American Securities Administrators Association, Inc.

# OPINION

*Per Curiam:*

In this case, we are asked to determine the meaning of the word "note," as defined as a "security," under NRS 90.295 of the Nevada Uniform Securities Act ("the Act"). The district court held that one-year notes issued by respondent Robert Marcus Friend were not securities under the Act.

We conclude that a plain, literal reading of the word "note," as contained in the definition of "security," under NRS 90.295 leads to absurd results and, therefore, we reject this interpretation. However, since the Act is based upon federal securities acts, we conclude that it is appropriate for this court to adopt the "family resemblance" test, as set forth by the United States Supreme Court in *Reves v. Ernst & Young,*[1] to determine when a note is a security. Applying this test, we conclude that the notes issued by Friend in this case are securities.

## FACTS

Respondent Robert Marcus Friend was a founding partner of MEI World Industries, Inc., which was a company located in Las Vegas and incorporated in Nevada in December 1993. MEI was formed for the purposes of operating a business importing goods from China. In addition to being President of MEI, Friend was also listed as one of two members of the company's first Board of Directors in the articles of incorporation. Friend was not licensed as a securities broker-dealer or sales representative in the State of Nevada.

Sometime between December 1993 and July 1994, MEI began advertising in the Las Vegas Review-Journal promising a 21.75 percent return on one-year notes in exchange for debt-bridge financing. Donald and Carola Bell contacted MEI in response to one of those advertisements. Upon doing so, the Bells received a brochure detailing the nature of the company and scheduled a meeting with Donald Brozan, a Vice-President/Treasurer of the company.

Donald Bell left this meeting under the impression that in exchange for making an investment in MEI, he and his wife would be issued "a one-year note, corporate note, that would pay the principal plus 20 some percent interest." He did not believe they were receiving stock certificates, shares, or any interest in the company. Rather, he understood that their investment was "going to be put in a separate Bank of America account and used strictly

---

[1] 494 U.S. 56, 57 (1990).

for debt-bridge financing, which was to pay for the cost of moving goods into the United States from China and pay off . . . [MEI's] suppliers." According to Bell, he was never informed of any risks or that any portion of the investment would be used for the personal expenses of MEI employees. He was also unaware that Friend had a previous conviction for procuring a false loan.

Attracted by the favorably high interest rate, the Bells made two investments in MEI. In June 1994, the Bells invested $20,000.00 drawn from a family trust account. In exchange, the Bells received a one-year corporate note, which was signed by Friend and promised a profitable return on their investment of anywhere between 21 percent and 25 percent. The total sum of the principal plus interest on this first note was to be paid to the Bells in June 1995. In November 1994, the Bells invested an additional $50,000.00 into MEI from funds drawn from the same family trust account. Again, the Bells were issued a corporate note, which this time promised a return of 25.50 percent. The total sum of the principal plus interest on this second note was to be paid in November 1995.

During the course of the following year, the Bells had occasional contact with employees of MEI. Unable to reach MEI by phone in August 1995, the Bells went to MEI's office to cash in their $20,000.00 note. To the Bells' surprise, MEI's office was vacant. Subsequently, the Bells filed a complaint with the Attorney General of Nevada.

In June 1998, the State charged Friend with two counts of securities fraud, two counts of offer or sale of unregistered security, two counts of transacting business as an unlicensed broker-dealer and/or sales representative, and two counts of obtaining money under false pretenses. In February 1999, a preliminary hearing was held in Las Vegas Justice Court. The case was soon referred to the district court.

In October 1999, Friend moved to dismiss the first six counts of the charges against him on the basis that the corporate note issued by Friend, through MEI, was not a "security" as defined by NRS 90.295 and, therefore, the Act did not apply. The district court noted that "there is no case law in the State of Nevada . . . defining the term security or what constitutes a security under the statute." The district court applied the "family resemblance" test. Applying this test, the district court held that the corporate notes issued by Friend, through MEI, were not securities. The district court reasoned that "to rule any other way would result in every single corporation which borrowed money in the private market being subject to the Securities Act." Accordingly, the first six counts of charges against Friend under the Act were dismissed.

## DISCUSSION

The meaning of a statute is a question of law reviewed de novo.[2] No deference is given to the district court's interpretation.[3] Here, this court must determine whether a one-year note issued in exchange for investment funds is governed under the Act. Specifically, this court must interpret the meaning of the word "note" under the definition of "security" contained in NRS 90.295. Therefore, our analysis must begin with the language of the statute itself.

### Plain meaning interpretation

The State argues that the definition of securities expressly includes notes and, therefore, this court should give the statute its plain meaning so as to include the notes issued by Friend in exchange for an investment in his business.[4] In response, Friend argues that there is ambiguity in the meaning of the word "note" under the Act.

This court has stated that when the words of a statute are clear and unambiguous, they will be given their plain, ordinary meaning.[5] There is no need to look beyond the language of the statute.[6] However, "if a statute is susceptible to more than one natural or honest interpretation, it is ambiguous."[7] When the meaning of a statute is ambiguous, legislative intent controls its interpretation.[8] This court will interpret the statute in accord with reason and public policy to avoid an absurd result.[9]

NRS 90.295 defines a "security" to mean, among other things, simply "a note." The word "note" is generally defined as "[a] written promise by one party . . . to pay money to another party . . . or to bearer."[10] We conclude that a literal, plain meaning interpretation of the word "note" as a "security" would lead to

---

[2]See *County of Clark v. Upchurch,* 114 Nev. 749, 753, 961 P.2d 754, 757 (1998).

[3]See *Carson City District Attorney v. Ryder,* 116 Nev. 502, 505, 998 P.2d 1186, 1188 (2000).

[4]The State cites to *State v. Tober,* 841 P.2d 206, 208 (Ariz. 1992), and *State v. Sheets,* 610 P.2d 760, 765 (N.M. Ct. App. 1980), to support its argument.

[5]See *Banegas v. SIIS,* 117 Nev. 222, 225, 19 P.3d 245, 247 (2001).

[6]See *id.*

[7]*Id.*

[8]*Id.*

[9]See *id.*

[10]*Black's Law Dictionary* 1085 (7th ed. 1999).

the absurd result of applying to nearly all notes issued in Nevada, including promissory notes issued in connection with such things as car loans or student loans. This court has stated that ''the unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation.''[11] Therefore, we must look elsewhere for meaning.

### *''Family resemblance'' test*

Alternatively, the State argues that this court should adopt the ''family resemblance'' test and, under the test, the ''notes'' issued by Friend are securities. Friend also urges this court to adopt the test; however, he argues that the ''notes'' are not securities.

The ''family resemblance'' test was established in *Reves* to determine when a note is a security.[12] Since both the Act and the federal securities acts similarly define a ''security'' as ''a note''[13] or ''any note,''[14] we conclude that it is appropriate for this court to adopt the test.

The test begins with the presumption that every note is a security,[15] which may be rebutted under either step of a two-tiered analysis.[16] Under the first step, the notes under review are compared to the following notes that are not securities, which includes those that are delivered in consumer financing; secured by a mortgage on a home; evidencing a ''character'' loan to a bank customer; formalizing an open-account debt incurred in the ordinary course of business; evidencing loans by commercial banks for current operations; short-term notes secured by a lien on a small business or some of its assets; or short-term notes secured by an assignment of accounts receivable.[17]

Here, the notes under review are referred to by Friend as corporate notes and were payable one year from the date of issuance with a return of the principal amount loaned plus 21 to 25 percent. These notes were issued to the Bells in exchange for $70,000.00. We conclude that the notes under review do not

[11]*Sheriff v. Smith,* 91 Nev. 729, 733, 542 P.2d 440, 443 (1975).

[12]494 U.S. at 67.

[13]NRS 90.295.

[14]Securities Act of 1933, 15 U.S.C. § 77b(a)(1) (1997); Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (1997).

[15]*Reves,* 494 U.S. at 67.

[16]*Stoiber v. S.E.C.,* 161 F.3d 745, 748-49 (D.C. Cir. 1998).

[17]494 U.S. at 65.

appear to be among the excluded notes in the above list. We must, therefore, move to the next step.

The next step of the test is to compare the notes under review to the list of notes above under the following four factors: (1) the motivations prompting a reasonable seller and buyer to enter into the transaction; (2) whether the instruments are used in common trading for speculation or investment; (3) the expectations of a reasonable investing public; and (4) whether another regulatory scheme significantly reduces the risk of the instrument.[18]

### (1) *Motivation*

The first step is to analyze what motivations would prompt a reasonable seller and buyer to enter into the transaction.[19] ''If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' ''[20] On the other hand, ''[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose . . . the note is less sensibly described as a 'security.' ''[21]

Here, according to Friend, the main purpose of the transactions was for debt-bridge financing of imports from China to the United States. However, according to bank statements obtained by the State, the funds invested by the Bells were used for general business, or personal, expenses. Moreover, the Bells were not purchasing consumer goods from MEI. Rather, it appears that the main purpose for investing funds into MEI was to earn a profit from a favorable interest rate. Therefore, under this first prong, we conclude that the motivation of Friend, the seller, and the Bells, the buyers, appears to be that of a security-type transaction.

### (2) *Plan of distribution*

The second step examines the distribution of the note '' 'to determine whether it is an instrument in which there is common

---

[18]*Id.* at 66.

[19]*Id.*

[20]*Id.*

[21]*Id.*

trading for speculation or investment.' ''[22] Common trading occurs when the instrument is '' 'offered and sold to a broad segment of the public.' ''[23]

Here, MEI placed an advertisement in a regional newspaper seeking potential investors. In this advertisement, MEI promised a high interest rate of return on one-year notes in exchange for debt-bridge financing. The record is unclear on how long this advertisement ran; however, it appears that it was placed in the newspaper more than once. As the newspaper is distributed throughout Southern Nevada, which is home to well over a million people, we conclude that this investment opportunity was offered to a broad segment of the public and that the plan of distribution involved common trading.

### (3) *Expectations*

The third step of the analysis considers "whether . . . [the notes] are reasonably viewed by purchasers as investments."[24] Under this step, we must determine if the seller of the notes calls them investments and, if so, whether it is reasonable for a prospective purchaser to believe them.[25]

Here, it appears that the Bells invested in MEI to make a profit on a high interest rate of return. Moreover, the advertisement in the newspaper portrayed the ''notes'' as investments. There is no evidence to establish that the notes issued to the Bells were not investments. Although Donald Bell did not view the ''notes'' as stocks or shares in MEI, it appears that the sole purpose of the transactions was for investment purposes. We conclude that the transactions appear to be ones involving securities.

### (4) *Need for securities laws*

The final step of the analysis examines the adequacy of other regulatory schemes in reducing the risk to the lender.[26] Although Friend has been charged with two counts of obtaining money under false pretenses, we conclude that there is a need for securities laws in Nevada. The purpose of the federal securities acts

---

[22]*Stoiber,* 161 F.3d at 750 (quoting *Reves,* 494 U.S. at 66).

[23]*Id.* at 750 (quoting *Reves,* 494 U.S. at 68).

[24]*Id.* at 751.

[25]*See id.*

[26]*Id.* at 751.

was " 'to eliminate serious abuses in a largely unregulated securities market.' "[27] Recognizing "the virtually limitless scope of human ingenuity . . . 'by those who seek the use of the money of others on the promise of profits,' "[28] Congress broadly defined the scope of securities laws. Like Congress, it appears that the Nevada Legislature recognized a similar need for such broad security regulations. We will give effect to that determination.

## CONCLUSION

We conclude that a plain, literal interpretation of the word "note" as defined by NRS 90.295 would lead to absurd results, and therefore, we reject such an interpretation. Although the district court correctly adopted the "family resemblance" test, we conclude that the court erred in holding that the notes issued by Friend were not securities. Therefore, we reverse the dismissal of the six counts of securities violations against Friend and remand this case to the district court to reinstate these charges and proceed to trial.

---

[27]*Reves,* 494 U.S. at 60 (quoting *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849 (1975)).

[28]*Id.* at 60-61 (quoting *S.E.C. v. Howey Co.,* 328 U.S. 293, 299 (1946)).