Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

September 14, 2020

## 2020 CO 72

**No. 18SC543 *Thompson v. People*—Colorado Securities Act—Security—Plain Error—Consecutive Sentencing.**

This case requires the supreme court to decide whether the court should adopt the family resemblance test from *Reves v. Ernst & Young*, 494 U.S. 56, 64–67 (1990), as the test for determining whether a note is a security for purposes of the Colorado Securities Act, §§ 11-51-101 to -1008, C.R.S. (2019) ("CSA").  If so, the court must then decide whether the division below erred in concluding that (1) the promissory note at issue was a security under the family resemblance test; (2) any error in the jury instruction defining "security" was not plain; and (3) consecutive sentences were permissible because different evidence supported the defendant's securities fraud and theft convictions.

The court now adopts the family resemblance test for determining whether a note is a security for purposes of the CSA.  Applying that test to the facts before it, the court concludes further that (1) the promissory note at issue was a security for purposes of the CSA; (2) any instructional error regarding the element of a

"security" was not plain because any error was not substantial; and (3) the convictions for securities fraud and theft at issue were not based on identical evidence and therefore consecutive sentences were permissible.

Accordingly, the court affirms the judgment of the division below.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2020 CO 72**

**Supreme Court Case No. 18SC543**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 14CA1332

**Petitioner:**

Steven Curtis Thompson,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Affirmed**
*en banc*
September 14, 2020

**Attorneys for Petitioner:**
Megan A. Ring, Colorado State Public Defender
Sean J. Lacefield, Deputy State Public Defender
   *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Brittany L. Limes, Assistant Attorney General
   *Denver, Colorado*

**Attorneys for Amicus Curiae, David S. Cheval, Acting Securities Commissioner for the State of Colorado:**
Philip J. Weiser, Attorney General
Robert W. Finke, Assistant Attorney General
Janna K. Fischer, Assistant Attorney General
Abby L. Chestnut, Assistant Attorney General
*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

¶1    This case requires us to decide if this court should adopt the family resemblance test from *Reves v. Ernst & Young*, 494 U.S. 56, 64–67 (1990), as the test for determining whether a note is a security for purposes of the Colorado Securities Act, §§ 11-51-101 to -1008, C.R.S. (2019) ("CSA").  If so, we must then decide whether the division below erred in concluding that (1) the promissory note at issue was a security under the family resemblance test; (2) any error in the jury instruction defining "security" was not plain; and (3) consecutive sentences were permissible because different evidence supported defendant Steven Thompson's securities fraud and theft convictions.[1]

¶2    We now adopt the family resemblance test for determining whether a note is a security for purposes of the CSA.  Applying that test to the facts before us, we conclude further that (1) the promissory note at issue was a security for purposes

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether the court of appeals erred in applying the family resemblance test from *Reves v. Ernst & Young*, 494 U.S. 56 (1990), to conclude that a promissory note was a security.

2. Whether the court of appeals erred in holding that the instructional error regarding the element of a "security" was not plain even though the error was plain at the time of appeal.

3. Whether the court of appeals erred in finding that the convictions were not based on identical evidence and consecutive sentences were permissible.

3

of the CSA; (2) any instructional error regarding the element of a "security" was not plain because any error was not substantial; and (3) the convictions for securities fraud and theft at issue were not based on identical evidence and therefore consecutive sentences were permissible.

¶3  Accordingly, we affirm the judgment of the division below.

## I.  Facts and Procedural History

¶4  Thompson worked as a real estate developer and was the sole member and manager of SGD Timber Canyon, LLC ("Timber Canyon"), a real estate company that, at the times pertinent here, held an interest in a number of undeveloped lots in the Timber Ridge development in Castle Rock, Colorado.  To buy those properties, Timber Canyon had initially obtained an approximately $11.9 million loan from Flagstar Bank.  The properties struggled financially, however, and went into foreclosure in October 2009.  Thereafter, in February 2010, Timber Canyon filed a bankruptcy petition, and Flagstar Bank sought relief from the automatic stay to allow it to proceed with the foreclosure.  The parties, however, entered into a stipulation under which the bank agreed to forbear from exercising its remedies against the properties, pending, among other things, Timber Canyon's making a $6.75 million payment by October 15, 2010.

¶5  Meanwhile, in the spring of 2010, Thompson met John Witt ("John"), a man who had worked in the construction industry in Denver and who wanted to

4

become a real estate developer.[2] John eventually began working with Thompson and signed a letter of intent indicating that John would eventually obtain an ownership interest in Thompson's company.

¶6 Shortly thereafter, and without disclosing the fact that the Timber Ridge properties were in foreclosure and subject to a forbearance agreement, Thompson solicited a $400,000 "investment" from John's parents, Thomas and Debra Witt ("the Witts"), whom he had met when they came to tour the properties. Thompson told the Witts that he would use the loan to purchase one of the lots in Timber Ridge, construct a house on that lot, and then resell it to a buyer who had been prequalified to purchase it. He told the Witts that because he had a prequalified buyer lined up to purchase the house, they would get all of their money back very quickly and that this would be a "very low risk investment." Thomas Witt thought the offer "didn't sound too bad because there was a qualified buyer for a huge profit in it." The Witts therefore agreed to make the investment, signed a document that Thompson had drawn up entitled "Timber Ridge Lot Purchase Agreement," and wired $400,000 in two equal wire transfers to Thompson.

---

[2] Because John's parents were also involved in the matters leading to this case, we will, for clarity, refer to John by his first name. We intend no disrespect.

5

¶7    A short time later, Thompson approached the Witts, through their son, about converting their $400,000 investment into a "bridge loan," which Thompson claimed would be used for the continued development of Timber Ridge. In an email to John, Thompson emphasized that the proposed "bridge loan" was a "no brainer," given that the loan was "very short term with lots of collateral" (namely, the land), and he stated that he "would not even consider it if [he] thought there were any risk to it." Thompson further said that the Witts would "have no risk as there is a guarantee takeout on the bridge loan" and that they "will make half of what we save or $1 million for doing the loan with no risk."

¶8    Ultimately, the Witts agreed to increase their initial $400,000 investment to $2.4 million, and they wired Thompson the additional $2 million. The Witts agreed to do so because (1) it was "a no risk—very low, low risk investment"; (2) they would make a profit on the deal, as the properties were allegedly appraised at $31 million; (3) Thompson had represented that the loan was "very short-term"; and (4) it would help their son as he was beginning his career as a developer.

¶9    In exchange for the Witts' investment, Thompson delivered a promissory note in the amount of $2.4 million and a guaranty agreement, listing a Mary Littman, who was purported to be the owner of Thompson's primary residence, as guarantor. The note and guaranty agreement identified Thompson's primary

residence (owned by Littman) and his second residence (owned by an LLC that Thompson controlled) as collateral, although the address stated for the second residence turned out to be incorrect. In addition, in the note, Thompson promised to repay the Witts their $2.4 million loan in full, as well as a "profit" of $240,000 and 8% annual interest, by January 12, 2011. At no point did Thompson disclose to the Witts that (1) his two alleged residences were already highly leveraged; (2) Timber Canyon had declared bankruptcy; (3) the Timber Ridge properties had been in foreclosure and were subject to a forbearance agreement; or (4) Flagstar Bank had valued the Timber Ridge properties at only $6.75 million (i.e., significantly less than the $31 million value that Thompson had represented to the Witts during their negotiations). Thomas Witt would later say that had he known these facts at the time he was dealing with Thompson, he "wouldn't have given [Thompson] a dime."

¶10 At about the same time during which Thompson was negotiating the increased investment from the Witts, Timber Canyon failed to pay Flagstar Bank the $6.75 million required to keep the properties out of foreclosure. Thompson, however, continued to keep the Witts in the dark regarding Timber Ridge's financial problems. Thereafter, in December 2010, the entire development sold at a public trustee sale for only $6.75 million. Thompson did not tell the Witts of the foreclosure sale and continued to maintain that he was "moving forward" with

7

the Timber Ridge development project. In reality, though, throughout the fall of 2010 and winter of 2011, Thompson used the Witts' money for items not related to Timber Ridge, including for the payment of his own attorney fees, checks made out to himself or to "cash," paying off the note on one of his two residences, and making improvements to that residence.

¶11 When the Witts' note ultimately came due in the winter of 2011, Thompson defaulted. He tried to renegotiate the note, offering different collateral, but the Witts refused.

¶12 After Thompson paid the Witts only $70,000 of the amount that he owed them, the Witts filed a civil lawsuit against him and also contacted law enforcement. Thereafter, the People charged Thompson with two counts of securities fraud under subsections 11-51-501(1)(b) and (1)(c), C.R.S. (2019), and one count of theft under section 18-4-401(1)(b), C.R.S. (2019). Thompson pleaded not guilty, and the case proceeded to trial.

¶13 At trial, the court instructed the jury, consistent with section 11-51-201(17), C.R.S. (2019), that a security is defined to include, among other things, "any note." Thompson did not object to this instruction, nor did he argue during the trial that the note that he gave the Witts was not a security. The jury ultimately convicted Thompson on all counts, and the court sentenced him to the Department of Corrections for twelve years on each of the securities fraud counts, to be served

8

concurrently, and eighteen years on the theft count, to be served consecutively to the securities fraud counts.

¶14 Thompson appealed, and, in a unanimous, published opinion, a division of the court of appeals affirmed his convictions. *People v. Thompson*, 2018 COA 83, __ P.3d __. As pertinent here, Thompson argued that (1) because the note at issue was not a security, insufficient evidence supported his securities fraud convictions; (2) the trial court erred by tendering an incorrect jury instruction regarding the meaning of "security"; and (3) his theft conviction had to run concurrently with his securities fraud convictions. *Id.* at ¶ 12. The division rejected each of these arguments in turn.

¶15 First, the division rejected Thompson's contention that because the note was not a "security" within the meaning of the CSA, insufficient evidence supported his securities fraud convictions. *Id.* at ¶¶ 13–32. Following the so-called "family resemblance test" developed by the United States Supreme Court in *Reves* and adopted by a prior division in *People v. Mendenhall*, 2015 COA 107M, ¶¶ 32–37, 363 P.3d 758, 767–68, which test we discuss more fully below, the division below concluded that the promissory note at issue was a security. *Thompson*, ¶¶ 16–17, 23–32.

¶16 Second, the division concluded that the trial court did not plainly err when it instructed the jury that a "security" included "any note." *Id.* at ¶¶ 33–37. The

9

division began by observing that in assessing plain error, a court only considers the status of the law at the time of a defendant's trial. *Id.* at ¶ 34. Because, at the time of Thompson's trial, Colorado case law had not directly addressed the issue of whether "any note" is a security, the division concluded that the law was not "well-settled" at the time of trial and therefore any error in the instruction would not have been obvious. *Id.* at ¶¶ 36–37.

¶17 Third, the division rejected Thompson's assertion that because his theft and securities fraud convictions were based on identical evidence, his sentence on the theft conviction had to run concurrently with his sentences on the securities fraud convictions. *Id.* at ¶¶ 67–72. In so concluding, the division determined that the convictions for securities fraud were based on Thompson's "misstatements and material omissions" in connection with the sale of a security to the Witts and that this element of securities fraud was not required for theft. *Id.* at ¶ 71. Conversely, the division concluded that Thompson's retention and use of the funds that he had received from the Witts for his personal benefit, which permanently deprived the Witts of the money's use, supported his conviction for theft but was not an element of evidence required for securities fraud. *Id.* The division thus concluded that different evidence supported each offense and therefore the imposition of a consecutive sentence on the theft conviction was proper. *Id.* at ¶ 72.

¶18 Thompson then petitioned for a writ of certiorari, and we granted that petition.

## II. Analysis

¶19 We begin by addressing Thompson's claim that the division improperly applied the *Reves* family resemblance test to determine that the promissory note at issue was a security. After concluding that the family resemblance test applies to determine whether a note is a security under the CSA, we apply that test and conclude that the division did not err in determining that the Witts' note was a security for purposes of the CSA.

¶20 Next, we turn to Thompson's claim of instructional error and conclude that any error committed by the trial court in instructing the jury that a security includes "any note" was not plain because, whether assessed at the time of trial or the time of appeal, any such error was not substantial. Accordingly, we need not reach Thompson's argument that we should adopt a "time of appeal" standard for assessing plain error.

¶21 Finally, we address Thompson's claim that the division erred in upholding his consecutive sentences for securities fraud and theft and conclude that the division properly determined that different evidence supported these convictions. We therefore conclude that the trial court did not abuse its discretion in imposing consecutive sentences in this case.

11

## A. *Reves v. Ernst & Young*

¶22 The question of whether we should adopt the family resemblance test for determining whether a note is a security involves both statutory interpretation and consideration of the proper legal standard to be applied here. We review issues of statutory interpretation de novo. *McCoy v. People*, 2019 CO 44, ¶ 37, 442 P.3d 379, 389. In construing a statute, we seek to ascertain and give effect to the General Assembly's intent. *Id.* To do so, we look first to the statutory language, giving its words and phrases their plain and ordinary meanings. *Id.* We read such words and phrases in context, and we construe them according to the rules of grammar and common usage. *Id.* Additionally, we "endeavor to effectuate the purpose of the legislative scheme." *Id.* at ¶ 38, 442 P.3d at 389. In doing so, we read that scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts, and we avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. *Id.* If the statute is unambiguous, then we apply it as written. *Id.* If the statute is ambiguous, however, then we may consider other aids to statutory construction, including the consequences of a given construction, the end to be achieved by the statute, and the statute's legislative history. *Id.* A statute is ambiguous when it is reasonably susceptible of multiple interpretations. *Id.*

¶23 A determination of the proper legal standard to be applied in a case and the application of that standard to the particular facts of the case present questions of law that we also review de novo. *A.R. v. D.R.*, 2020 CO 10, ¶ 37, 456 P.3d 1266, 1276.

¶24 The CSA's purpose is "to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." § 11-51-101(2), C.R.S. (2019). Additionally, the CSA is "remedial in nature and is to be broadly construed to effectuate its purposes." *Id.* And, pertinent here, the CSA's provisions are to be "coordinated with the federal acts and statutes" that the CSA references "to the extent coordination is consistent with both the purposes and the provisions" of the CSA. § 11-51-101(3).

¶25 The CSA defines a "security" to include, in pertinent part, "any note." § 11-51-201(17). Notwithstanding this broad language, the parties agree that this definition, like its counterpart under the federal Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78c(a)(10) (2012), is not to be construed literally and that the family resemblance test adopted in *Reves*, 494 U.S. at 64–67, should apply here. We also agree, and an understanding of federal jurisprudence regarding the definition of a "note" is important to our analysis in this regard.

¶26 Although not itself involving a note, the Supreme Court's decision in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), provides the starting point for

our discussion. In *Howey*, the Supreme Court defined an "investment contract" for purposes of the 1934 Act as a "scheme involv[ing] an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* We adopted the same test, for purposes of the CSA, in *Lowery v. Ford Hill Investment Co.*, 556 P.2d 1201, 1204–05 (Colo. 1976), noting that although we are not bound by federal law in construing the CSA, we deem federal authorities persuasive, given that the provisions and purposes of the CSA parallel those of federal enactments.

¶27 Thereafter, in *People v. Milne*, 690 P.2d 829, 833 (Colo. 1984), we appear to have expanded the application of *Howey* to financial instruments other than investment contracts, including "investment notes." We opined, "The touchstone of a security is the presence of an investment in a common enterprise that is premised on a reasonable expectation of profits to be derived from the entreprenurial [sic] or managerial efforts of others." *Id.*

¶28 Notwithstanding our apparent decision to extend the *Howey* test beyond investment contracts, federal courts disagreed as to the proper test for determining whether a note is a security, with the Eighth and D.C. Circuits relying on *Howey*'s definition of an investment contract and other courts developing different tests. *Compare Arthur Young & Co. v. Reves*, 856 F.2d 52, 54 (8th Cir. 1988) (relying on *Howey*'s definition of an investment contract to determine whether the "demand

14

notes" at issue were securities), *rev'd sub nom. Reves v. Ernst & Young*, 494 U.S. 56 (1990), *and Baurer v. Planning Grp., Inc.*, 669 F.2d 770, 778–79 (D.C. Cir. 1981) (relying on *Howey* to conclude that the short-term promissory note at issue was a security), *rejected by Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990), *with Futura Dev. Corp. v. Centex Corp.*, 761 F.2d 33, 40–41 (1st Cir. 1985) (adopting the "commercial/investment test" to determine whether a note is a security); *Union Planters Nat'l Bank of Memphis v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1181–82 (6th Cir. 1981) (applying *Howey* and the so-called "risk capital" test to determine whether a loan participation was a security); *and Exch. Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137–39 (2d Cir. 1976) (applying the "family resemblance test" to determine that certain notes were securities).

¶29     In *Reves*, 494 U.S. at 64–67, the Supreme Court finally resolved this debate. As an initial matter, the Court declined to expand the *Howey* test to the context of notes because, in the Court's view, "To hold that a 'note' is not a 'security' unless it meets a test designed for an entirely different variety of instrument 'would make the [federal Securities] Acts' enumeration of many types of instruments superfluous' and would be inconsistent with Congress' intent to regulate the entire body of instruments sold as investments." *Id.* at 64 (quoting *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985)).

¶30    The Court then proceeded to adopt the so-called "family resemblance test" for determining whether a note is a security. *Id.* at 64–65. Under that test, a note is presumed to be a security unless it fits into one of seven enumerated categories of non-securities: (1) notes delivered in consumer financing; (2) notes secured by a mortgage on a home; (3) short-term notes secured by liens on a small business or some of its assets; (4) notes evidencing a "character" loan to a bank customer; (5) short-term notes secured by an assignment of accounts receivable; (6) notes that simply formalize an open-account debt incurred in the ordinary course of business; or (7) notes evidencing loans by commercial banks for current operations. *Id.* at 65.

¶31    The presumption that a note is a security if it does not fit within one of these seven enumerated categories may be overcome, however, if it bears a "strong family resemblance" to one of those types of notes. *Id.* at 66–67. To determine if a note bears such a resemblance, a court examines four factors:

> First, we examine the transaction to assess the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security." Second, we examine the "plan of distribution" of the instrument to determine whether it is an instrument in which there is "common trading for speculation or

16

investment." Third, we examine the reasonable expectations of the investing public: The Court will consider instruments to be "securities" on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not "securities" as used in that transaction. Finally, we examine whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary.

*Id.* (citations omitted).

¶32 If an instrument is not sufficiently similar to one of the items on the list, then the decision as to whether another category should be added is to be made by examining the same factors. *Id.* at 67.

¶33 The question thus becomes whether we should overrule *Milne*, which, as noted above, appears to have adopted the *Howey* test for determining whether a note is a security, and adopt the *Reves* family resemblance test instead. Cognizant of the principles of stare decisis, but also recognizing that those principles allow us to depart from prior precedent when sound reasons exist for doing so, *Russell v. People*, 2020 CO 37, ¶ 20, 462 P.3d 1092, 1096, we conclude that we should overrule *Milne* and adopt the family resemblance test. We reach this conclusion for several reasons.

¶34 First, as noted above, section 11-51-101(3) provides that the CSA is to be coordinated with the federal acts and statutes that it references. As our case law shows, historically, we have tracked the Supreme Court's interpretation of parallel

17

provisions of the federal securities laws, *see Milne*, 690 P.2d at 833–34; *Lowery*, 556 P.2d at 1204–05, and we perceive no basis for declining to do so here. This is particularly so given that (1) the definition of a "security" is identical in the CSA and the 1934 Act and (2) we have previously observed that "insofar as the provisions and purposes of our statute parallel those of the federal enactments, such federal authorities are highly persuasive." *Cagle v. Mathers Family Tr.*, 2013 CO 7, ¶ 19, 295 P.3d 460, 465 (quoting *Lowery*, 556 P.2d at 1204).

¶35 Second, the statutory definition of "security" in both the 1934 Act and the CSA includes many different types of financial instruments, including, but not limited to, notes and investment contracts. *See* 15 U.S.C. § 78c(a)(10); § 11-51-201(17). To apply the *Howey* test, which deals with the types of investment contracts that constitute securities, to determine whether any other kind of financial instrument constitutes a security would render the CSA's enumeration of many different types of instruments superfluous. *See Reves*, 494 U.S. at 64. We, however, may not do so. *See McCoy*, ¶ 38, 442 P.3d at 389.

¶36 Third, in our view, the family resemblance test provides an analytical framework that harmonizes (1) the CSA's broad definition of a security, which includes "any note"; (2) federal and state case law recognizing that, notwithstanding such broad language, some notes are not, in fact, securities; and (3) the above-referenced purposes to be achieved by the CSA. *See* § 11-51-101(2);

18

§ 11-51-201(17); *Lowery*, 556 P.2d at 1205 ("The hallmark of state and federal securities regulation has always been close attention to the facts of each case and a substantive appraisal of the commercial realities of the offering."). Specifically, the family resemblance test takes into account the language of and policy considerations animating the CSA while providing courts the flexibility to address the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Reves*, 494 U.S. at 61 (quoting *Howey*, 328 U.S. at 299).

¶37    Finally, we note that the clear trend among state courts around the country is to adopt the family resemblance test for determining whether a note is a security for purposes of their state securities acts. *See, e.g.*, *Silvia v. Sec. Div.*, 810 N.E.2d 825, 831–32 (Mass. Ct. App. 2004) (replacing the *Howey* test with the *Reves* test to determine whether certain agreements that were akin to promissory notes were securities under the Massachusetts Uniform Securities Act); *State v. Friend*, 40 P.3d 436, 439–40 (Nev. 2002) (adopting the family resemblance test for determining whether a note is a security under the Nevada Uniform Securities Act); *cf. State v. Pedersen*, 95 P.3d 385, 388 (Wash. Ct. App. 2004) (applying the family resemblance test to determine whether certain trust certificates and a loan agreement were securities under the Securities Act of Washington). Although we, of course, are not bound by such determinations, we have often found persuasive our sister

states' interpretations of statutes and rules with language similar to our own, and for the reasons noted above, we do so here. *See, e.g.*, *People v. Julien*, 47 P.3d 1194, 1198 (Colo. 2002) (considering federal precedent and that of states with judicial ethics rules similar to Colorado's in construing the provisions of a parallel Colorado rule); *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54–55 (Colo. 2001) (finding persuasive the Washington Supreme Court's interpretation of provisions of the Washington Consumer Protection Act in construing the Colorado Consumer Protection Act because of the similar provisions of those acts).

¶38 For these reasons, we now overrule *Milne* and adopt the family resemblance test for determining whether a note is a security within the meaning of the CSA. We thus turn to the facts before us and consider whether the note at issue was a security under that test.

¶39 To begin, we observe that the note at issue did not expressly fall within any of the seven enumerated categories of non-securities because it was neither (1) a note delivered in consumer financing; (2) a note secured by a mortgage on a home; (3) a short-term note secured by a lien on a small business or some of its assets; (4) a note evidencing a "character" loan to a bank customer; (5) a short-term note secured by an assignment of accounts receivable; (6) a note that simply formalizes an open-account debt incurred in the ordinary course of business; nor (7) a note evidencing a loan by a commercial bank for current operations. *See Reves*, 494 U.S.

20

at 65. Accordingly, we must presume that the note was a security unless it bore a strong family resemblance to one of the foregoing enumerated types of notes. *See id.* at 65–67. To determine whether the note bore such a resemblance, we must consider the four factors described above. *See id.* at 66–67. In doing so, we do not agree with Thompson's contention that the note at issue bore a strong family resemblance to a short-term loan secured by a lien on a small business or some of its assets.

¶40 The first factor of the family resemblance test considers the motivation of the buyer and seller to enter into the transaction. *Id.* at 66. Specifically, if the record demonstrates that the seller's purpose was to raise money for the general use of a business enterprise or to finance substantial investments and the buyer's principal motivation was to make a profit on the transaction, then the note is likely to be a security. *Id.* If, in contrast, the parties entered into the transaction to correct for the seller's cash-flow difficulties or advance some other commercial or consumer purpose, among other things, then the note is less likely to be deemed a security. *Id.*

¶41 Here, the record demonstrates that Thompson's stated motivation in entering the transaction was (1) to raise money to buy more properties in Timber Ridge for residential development and (2) to pay a lower interest rate and fees on the loan than he would have obtained from a different lender. These facts alone

tend to undermine Thompson's suggestion that the note at issue was merely a short-term loan to cover Timber Canyon's temporary cash-flow problems. *See Douglass v. Stanger*, 2 P.3d 998, 1004 (Wash. Ct. App. 2000) (observing that a note that "anticipated the purchase of land and development of a substantial shopping center" was not a "short-term note for a noncommercial purpose," as a developer had alleged).

¶42    The Witts, in turn, testified that they agreed to the deal because it was a "no risk" investment that essentially guaranteed them a substantial profit. Indeed, the note at issue reflected the primacy of the Witts' profit motive, as it required Thompson to repay the $2.4 million in full plus a "profit" of $240,000 and 8% annual interest. Accordingly, the first factor of the family resemblance test supports a finding that the note at issue was a security.

¶43    The second factor requires a court to examine the plan of distribution of the note to determine whether it was an instrument in which there was "common trading for speculation or investment." *Reves*, 494 U.S. at 66 (quoting *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943)). This does not mean, however, that the seller must have had a plan for distribution of the note to a broad segment of the public. *McNabb v. S.E.C.*, 298 F.3d 1126, 1132 (9th Cir. 2002). To the contrary, the limited distribution of an instrument like that at issue here "must be weighed against the purchasing individual's need for the protection of the securities laws."

22

*Id.* Thus, even if an investment instrument will not be commonly distributed, it may contemplate a "speculative venture" that would be deemed to satisfy the second prong of the family resemblance test. *See Douglass*, 2 P.3d at 1004; *see also Speculation*, Black's Law Dictionary (11th ed. 2019) (defining "speculation" as "[t]he buying or selling of something with the expectation of profiting from price fluctuations").

¶44 Here, the promissory note and guaranty secured a $2.4 million loan in a real estate development project that, while allegedly "low risk," was still a speculative venture, as its success was contingent on Thompson's being able to secure longer-term, permanent financing that would "take out" what was represented to be the short-term loan and to complete the purchase of the lots that would further secure the Witts' investment. We therefore conclude that the second factor likewise tends to support the conclusion that the note at issue was a security.

¶45 The third factor requires a court to consider the reasonable expectations of the investing public regarding the character of the note. *Reves*, 494 U.S. at 66. The "fundamental essence of a 'security' [is] its character as an 'investment.'" *Id.* at 68–69. Thus, in deciding whether notes are securities, a court must consider "whether a reasonable member of the investing public would consider these notes as investments." *McNabb*, 298 F.3d at 1132. "Under this step, we must determine if the seller of the notes calls them investments and, if so, whether it is reasonable

23

for a prospective purchaser to believe them." *Friend*, 40 P.3d at 441; *see also*

*Stoiber v. S.E.C.*, 161 F.3d 745, 751 (D.C. Cir. 1998) (explaining that when a seller

calls a note an "investment," it is reasonable for a prospective purchaser to take

the seller at its word, absent indications to the contrary).

¶46 We have little difficulty concluding that a reasonable member of the

investing public would have considered the note at issue to be an investment. In

soliciting the loan, Thompson himself repeatedly referenced the fact that the Witts

were making an "investment." In addition, he emphasized that he would use the

money from the Witts to purchase additional lots in Timber Ridge. And the note

specified that the Witts not only would be paid back in full, but also would receive

8% interest and $240,000 in "profit." Because these facts speak to motivations and

business objectives commonly associated with securities, a reasonable member of

the investing public would likely believe that the investment was a security. *See*

*S.E.C. v. Wallenbrock*, 313 F.3d 532, 539 (9th Cir. 2002) (noting that the third *Reves*

factor "is closely related to the first factor—motivation for the transaction—and

thus the considerations discussed vis-à-vis that factor also come into play here").

¶47 Finally, the fourth factor requires a court to consider the existence of any

other regulatory scheme that significantly reduces the risk of the instrument,

thereby making the application of the securities laws unnecessary. *Reves*, 494 U.S.

at 67. Thompson contends that because the note was secured by his two personal

residences, against which the Witts could proceed, this factor weighs in favor of a finding that the note was not a security. As noted above, however, this purported collateral was already heavily leveraged, a fact that Thompson never disclosed to the Witts. In such circumstances, the fact that collateral was provided in name did not reduce the risk of the investment so as to make the application of the securities laws unnecessary. *See Pedersen*, 95 P.3d at 390 (rejecting the defendant's argument that the purported collateral significantly reduced the risk of the instrument at issue when such collateral was unavailable because it "had previously been assigned to other creditors").

¶48 Accordingly, consideration of the family resemblance test's four factors persuades us that the note at issue was a security.

¶49 In so concluding, we are unconvinced by Thompson's reliance on *Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577 (6th Cir. 2000). In *Bass*, a sophisticated investor agreed to provide financing to a Canadian company that manufactured golf simulators. *Id.* at 581. The investor made two loans that "were intended to serve as 'bridge loans' to help [the borrower] meet its operations costs in the period leading up to the issuance of [the borrower's] securities in a private placement." *Id.* at 580. The loans were secured by a lien on "virtually all assets" of the borrower and a related company. *Id.* at 581. In addition, the investor received a purchase warrant for the borrower's stock, as well as a hypothecation and pledge of all of

25

the related company shares held by the borrower and an assignment of a debenture held by it. *Id.*

¶50    Ultimately, the private placement failed due to insufficient subscription, and the borrower defaulted on the bridge loans. *Id.* at 582. The investor then filed a civil suit under the 1934 Act and other federal and state securities laws, but the Sixth Circuit subsequently concluded, as pertinent here, that the notes at issue (as distinct from the purchase warrant) were not securities. *Id.* at 585–86. In support of this determination, the court observed that (1) the first and third *Reves* factors were "washouts" because the notes at issue had characteristics of both securities and non-securities; (2) the plan of distribution tilted against the notes being securities, given that the transaction was unique and heavily negotiated with a single buyer; and (3) the extensive collateral securing the notes militated against deeming them securities. *Id.*

¶51    Here, it is true that Thompson characterized the Witts' $2.4 million investment as a bridge loan with a "guarantee takeout." The record, however, demonstrates that Thompson did not, in fact, use the loan as a "bridge loan" is typically used. "Bridge loans are short-term loans that ordinarily are intended to meet a company's capital needs until it is able to obtain long-term financing." David J. Kendall, *Venture Capital Lending: Usury and Fiduciary Duty Concerns*, 33 Colo. Law. 49, 49 (Apr. 2004). Thompson did not solicit the loan for purposes

26

of short-term operational funding for existing operations. Rather, he told the Witts that he would use the funds to purchase additional lots in the Timber Ridge project. Moreover, Thompson did not provide the "guarantee takeout" (i.e., the permanent financing that would be the source of repayment of the Witts' loan) that the note required. *See* 2 Alvin L. Arnold & Myron Kove, *Construction and Development Financing* § 5:1 (3d ed. Supp. June 2020) (defining "takeout"). And the record shows that the Witts entered into the arrangement at issue because it was a "no risk" investment in additional lots that would make them a profit, not because it was a stop-gap resource to alleviate Thompson's momentary cash-flow difficulties. Lastly, as noted above, the collateral that Thompson allegedly provided to secure the Witts' loan was already highly leveraged, unlike the assets that the borrower in *Bass* had provided as collateral. *See Bass*, 210 F.3d at 581, 585.

¶52 For all of these reasons, *Bass* is distinguishable from the present case, and we conclude that the division correctly determined that the promissory note between Thompson and the Witts was a security for purposes of the CSA.

## B. Jury Instruction

¶53 Thompson next contends that the division erred in concluding that any error in the trial court's instruction regarding the definition of a "security" was not plain. Although Thompson acknowledges that the law on this issue was unsettled at the time of trial, he argues that under *Mendenhall*, ¶ 37, 363 P.3d at 768, the error

27

in the instruction was plain at the time of appeal, and he urges this court to follow *Henderson v. United States*, 568 U.S. 266, 273 (2013), and conclude that plain error is to be assessed at the time of appeal. We need not decide whether plain error should be assessed at the time of appeal, as opposed to at the time of trial, however, because we conclude that, at either time, any error was not plain.

¶54 When, as here, a defendant does not object to an asserted error at trial, we review any such error under the plain error standard. *People v. Miller*, 113 P.3d 743, 745 (Colo. 2005). Plain error addresses error that is both obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Id.* at 750. An error is obvious when it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law. *Scott v. People*, 2017 CO 16, ¶ 16, 390 P.3d 832, 835. "Moreover, an erroneous jury instruction does not normally constitute plain error where the issue is not contested at trial or where the record contains overwhelming evidence of the defendant's guilt." *Miller*, 113 P.3d at 750.

¶55 Here, tracking the statutory definition contained in section 11-51-201(17) almost verbatim, the trial court instructed the jury, in pertinent part:

> "Security" means any note . . . or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

¶56     Although we have now made clear that not every note is, in fact, a security, Thompson never disputed at trial that the note at issue was a security. He essentially argued, instead, that he had been honest with the Witts about the financial condition of his companies and of the Timber Ridge development, the risks associated with their loan, and his issues with Flagstar Bank and that therefore he did not commit securities fraud. Moreover, although Thompson did not expressly refer to the note as a "security," his counsel referred in her opening statement to the deal as a "really good investment opportunity," and she spoke in both her opening statement and closing argument about the Witts' "investment" and the "profit" that they had hoped to make on the loan, all of which tended to suggest that the note was, in fact, a security.

¶57     Because Thompson never contested at trial that the note at issue was a security, we cannot say that any error by the trial court in defining the term "security" so undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction. And we would reach this conclusion whether the error were reviewed as of the time of trial or the time of appeal. Accordingly, we conclude that any such error was not substantial and therefore was not plain. *See People v. Lozano-Ruiz*, 2018 CO 86, ¶ 7, 429 P.3d 577, 578 (concluding that the trial court did not plainly err in defining the term "sexual

penetration" as it did when the defendant never contested at trial that sexual penetration had occurred).

## C. Sentencing

¶58    Finally, Thompson asserts that the division erred in concluding that because his convictions were not based on identical evidence, his consecutive sentences on the securities fraud and theft charges were proper.  We are not persuaded.

¶59    Absent legislation to the contrary, sentencing courts in Colorado have discretion to order sentences for different convictions to be served either consecutively or concurrently.  *Schneider v. People*, 2016 CO 70, ¶ 22, 382 P.3d 835, 841.  When, however, identical evidence supports each of multiple convictions, then the court must sentence the defendant concurrently, except when multiple victims are involved, in which case the court may, in its discretion, impose consecutive sentences.  § 18-1-408(3), C.R.S. (2019).

¶60    In construing section 18-1-408(3), we have analyzed identical evidence by considering whether the acts underlying the convictions were sufficiently separate.  *Allman v. People*, 2019 CO 78, ¶ 23, 451 P.3d 826, 832.  Specifically, we have said that to decide whether identical evidence supported multiple convictions, we must "determine if the separate convictions were based on more than one distinct act and if so, whether those acts were separated by time and place."  *Juhl v. People*, 172 P.3d 896, 901 (Colo. 2007).  In conducting this analysis,

we focus on the evidence that supported the convictions, not on the evidence necessarily required to prove the elements of those convictions. *Id.* at 902.

¶61 A trial court loses its discretion to choose between consecutive or concurrent sentences "only if the evidence supports no other conclusion than that the charges are based on identical evidence." *People v. Muckle*, 107 P.3d 380, 383 (Colo. 2005). The mere possibility that the jury may have relied on identical evidence in returning more than one conviction is not alone sufficient to trigger the mandatory concurrent sentencing provision. *Id.*

¶62 Here, the prosecution charged Thompson with one count of securities fraud (untrue statement or material omission), one count of securities fraud (fraud or deceit), and one count of theft of a thing of value of $20,000 or more. Securities fraud (untrue statement or material omission) required the prosecution to prove that Thompson had made an untrue statement of a material fact, or omitted to state a material fact necessary to make the statements made not misleading, in connection with the offer, sale, or purchase of any security. § 11-51-501(1)(b). Securities fraud (fraud or deceit) required the prosecution to prove that in connection with the offer, sale, or purchase of any security, Thompson had engaged in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." § 11-51-501(1)(c). And the theft count required the prosecution to prove that Thompson had obtained, retained, or

31

exercised control over anything of value of the Witts', without authorization or by threat or deception, and that he had knowingly used, concealed, or abandoned that thing of value in such a manner as to deprive the Witts permanently of its use or benefit. § 18-4-401(1)(b).

¶63 On the record before us, we cannot say that the evidence supports no other conclusion than that these charges were based on identical evidence. With regard to his securities fraud convictions, Thompson's statements to the Witts during their loan negotiations that "no risk" was associated with the loan and his failure to tell the Witts that (1) Timber Canyon had filed for bankruptcy protection; (2) the Timber Ridge properties were in foreclosure; and (3) his personal residences were highly leveraged and thus did not provide sufficient collateral are all evidence of untrue statements, material omissions, and fraud and deceit in connection with the offer, sale, or purchase of a security. Thompson's theft conviction, in contrast, was supported by the fact that after he had obtained the Witts' money, Thompson used that money to pay personal expenses, including making improvements on one of his two homes, paying off a note on that home, and giving monetary gifts to his children. The mere fact that the jury could have relied on the statements that Thompson had made during the loan negotiations to find one of the elements of the theft count, namely, that Thompson had obtained a thing of value from the Witts through deception, is not alone sufficient to trigger the mandatory

32

concurrent sentencing provision, given that other, different acts also supported the theft conviction. *See Muckle*, 107 P.3d at 383.

¶64 Because distinct acts that occurred at different times supported Thompson's securities fraud convictions, on the one hand, and his theft conviction, on the other, we conclude that the trial court did not err in imposing consecutive sentences for those convictions.

## III. Conclusion

¶65 For the forgoing reasons, we adopt the family resemblance test for determining whether a note is a security under the CSA, and applying that test here, we conclude that the note at issue was a security for purposes of the CSA. We further conclude that because Thompson did not contest at trial the fact that the note at issue was a security, the trial court did not plainly err in instructing the jury that a security includes "any note." Finally, because different evidence supported Thompson's convictions for theft and securities fraud, we conclude that the trial court did not err in ordering consecutive sentences on those counts.

¶66 Accordingly, we affirm the judgment of the division below.