22CA1785 Peo v Schendorf 04-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1785
Jefferson County District Court No. 21CR1192
Honorable Robert Lochary, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Lance Petersen Schendorf,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 16, 2026

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, M. Shelby Deeney, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Lance Petersen Schendorf, appeals the trial court's judgment of conviction entered after a jury found him guilty of one count of possession with intent to distribute a controlled substance and two counts of unlawful possession of a controlled substance. We affirm.

## I.     Background

¶ 2     At 5:45 a.m. on May 6, 2021, Jefferson County Regional SWAT used a battering ram to enter an apartment in Arvada. Once inside, the SWAT team located seven individuals, including Schendorf.

¶ 3     The apartment had two bedrooms, an office, a bathroom, a living room, a kitchen, and a dining area. The doors to all the rooms were opened or unlocked, except for the office. Officers used force to unlock the office door. After the SWAT team cleared out the apartment's occupants, detectives from the North Metro Drug Task force began searching the apartment.

¶ 4     In the office, detectives found a desk with computer monitors, several small bags, a glass pipe, a scale, prescription bottles, a small scoop, and a container with a "white crystal" substance. They also found mail with Schendorf's name (but a different address) and

a prescription bottle with Schendorf's name on it near the computer monitors.

¶ 5 Detectives opened an unlocked safe on a shelf in the office and found a white substance inside. During the search, detectives found two bags of suspected narcotics at the bottom of a trash can near the desk, which they collected for testing. Detectives found another safe in the office's closet. The second safe was locked, so they pried it open. Detectives found a credit card with Schendorf's name on it in the second safe. Detectives didn't find mail, credit cards, prescription medication, or documents with any other names, besides Schendorf's, during their search of the apartment.

¶ 6 During the search, detectives found a total of 10.39 pounds of methamphetamine and a tin containing pills. Of the pills found, six tablets were identified as fentanyl — a schedule II controlled substance — and fourteen tablets were identified as methylenedioxyamphetamine (MDA) — a schedule I controlled substance.

¶ 7 The People charged Schendorf with one count of possession with intent to distribute a controlled substance under section 18-18-405(2)(a)(I)(A), C.R.S. 2025, and two counts of unlawful

possession of a controlled substance under section 18-18-403.5(1), C.R.S. 2025 — one for possession of fentanyl and one for possession of MDA.

¶ 8　　The jury found Schendorf guilty of all three charges, and the court sentenced him to a controlling term of twenty years in the custody of the Department of Corrections.

## II.　Analysis

¶ 9　　On appeal, Schendorf contends that (1) the evidence against him was insufficient to sustain a conviction for possessing a controlled substance with intent to distribute; (2) the trial court reversibly erred by denying his motion to suppress evidence; (3) the trial court's admission of improper testimony violated his right to a fair trial; and (4) these errors cumulatively deprived him of a fair trial.　We address and reject each contention in turn.

## A.　Sufficiency of Evidence

¶ 10　　Schendorf contends that there is insufficient evidence to support the jury's finding that he knowingly possessed methamphetamine and intended to distribute it.　We disagree.

## 1. Additional Facts

¶ 11    Detective Daniel Gomez oversaw the execution of the search warrant and testified at trial as an expert in narcotics distribution and trafficking. Gomez identified the contents of physical and photo exhibits and testified that the size of bags found in the living room was consistent with the size of bags typically associated with a "user's amount of a controlled substance," commonly referred to as "micro baggies." He also testified that when a user purchases methamphetamine, it's put into small bags, weighed (usually in grams), and sold according to weight. Gomez identified a photo of a scale and testified that scales are commonly used in the sale of controlled substances. He also identified a small scooper and explained those were "often used to scoop [out a substance] . . . and weigh it."

¶ 12    When asked about a particular exhibit, Gomez testified that it was a bag collected from the apartment, which appeared to contain a controlled substance consistent with what he knows methamphetamine to look like. He similarly identified six other exhibits as bagged substances collected during the search. Gomez testified that there was "a little over ten pounds" of

methamphetamine recovered from the apartment, and based on his training and experience, that amount of methamphetamine was "distribution level" and not for personal use. Gomez said there are roughly 453 grams in a pound and that, even at that weight, a typical user — who uses one to four grams — would not carry a pound of methamphetamine because it would be akin to walking around with $1,700 to $2,200 dollars.

¶ 13    Natasha Collins, an agent with the Colorado Bureau of Investigation, testified as an expert in forensic chemistry and said that she had tested three of the physical exhibits admitted into evidence. Collins confirmed that one of the exhibits was a bag containing a substance that weighed 453.25 grams and had tested positive for methamphetamine. Collins explained that even if she had received other packages containing suspected methamphetamine, she wouldn't have tested them because "Colorado is . . . a weight state, meaning that there [are] weight thresholds in the [statutes]" and that the "maximum weight threshold for methamphetamine is 112 grams." Because the bag that she tested "had already met that maximum weight threshold, . . . there was no reason for [her] to keep testing."

## 2.    Standard of Review

¶ 14    We review the record de novo to determine whether the evidence was sufficient in quantity and quality to sustain a defendant's conviction.  *People v. Price*, 2023 COA 96, ¶ 16.  "Our review examines the relevant direct and circumstantial evidence as a whole to analyze whether the evidence is substantial and sufficient for a reasonable mind to find the defendant guilty beyond a reasonable doubt."  *Id.*

¶ 15    "The prosecution has the burden of establishing a prima facie case of guilt through the introduction of sufficient evidence."  *McCoy v. People*, 2019 CO 44, ¶ 63.  Evidence is sufficient where there is more than a modicum of relevant evidence, *Price*, ¶ 17, but "[a] criminal verdict may not be based on guessing, speculation, or conjecture," *People v. Pratarelli*, 2020 COA 33, ¶ 14.  In assessing the sufficiency of the evidence, (1) a defendant's mental state may be inferred from their conduct and other evidence, including the circumstances surrounding the commission of the crime; (2) the prosecution, rather than the defendant, must be given the benefit of every reasonable inference that can be drawn from the evidence; and (3) where reasonable minds could differ, the evidence is

sufficient to sustain a conviction. *People v. Robinson*, 226 P.3d 1145, 1154 (Colo. App. 2009). While the prosecution receives the benefit of every favorable inference reasonably drawn, "there must be a logical and convincing connection between the facts established and the conclusion inferred." *Clark v. People*, 232 P.3d 1287, 1292 (Colo. 2010).

### 3. Knowing Possession

¶ 16    Schendorf contends that the prosecution failed to prove that he knowingly possessed methamphetamine because it didn't establish that he had "dominion and control" over the premises where detectives found the methamphetamine. In support, Schendorf asserts that at least six other men were in the apartment at the time of the search and that the prosecution failed to prove that he had exclusive possession of the apartment. Schendorf also claims that there weren't any circumstances that could buttress the inference that he knew methamphetamine was present because he wasn't found near the locked office at the time of the search, there were no drugs on his person, no one testified that he had control over the office, the prosecution didn't introduce fingerprint evidence or scientific evidence linking him to the drugs, and there was no

7

testimony proving that he had a key to the office.  We disagree with both contentions.

### a. Applicable Law

¶ 17    It is unlawful to knowingly possess a controlled substance with the intent to distribute.  § 18-18-405(1)(a).  To sustain a conviction for possession of a controlled substance, the prosecution must prove that the defendant had knowledge that he possessed a narcotic drug and that he knowingly intended to possess the drug. *Robinson*, 226 P.3d at 1154.  A conviction for possession may be predicated on circumstantial evidence.  *Id.*  The drugs need not be found on the defendant's person if they are "found in a place under his or her dominion and control."  *Id.*  If an individual has exclusive possession of the premises, then knowledge of possession may be inferred by the jury.  *People v. Yeadon*, 2018 COA 104, ¶ 25, *aff'd*, 2020 CO 38.  However, if a person does not have exclusive possession of the premises in which drugs are found, an inference of possession may not be drawn "unless there are statements or other circumstances tending to buttress the inference."  *People v. Stark*, 691 P.2d 334, 339 (Colo. 1984) (quoting *Petty v. People*, 447 P.2d 217, 220 (Colo. 1968)).

## b. Analysis

¶ 18    The prosecution didn't introduce evidence like a lease agreement or utility bill indicating that Schendorf had exclusive possession of the apartment. *Cf. People v. Poe*, 2012 COA 166, ¶¶ 17-18 (holding that evidence was sufficient to support the jury's conclusion that the defendant exercised dominion and control over the premises where drugs were found because the apartment belonged to the defendant and there was no evidence of other individuals in the apartment). But, in the locked office where they discovered the methamphetamine and drug paraphernalia, detectives found several items bearing Schendorf's name, including mail, a prescription bottle, and a credit card. Moreover, detectives found the credit card in a locked safe within the locked office. While these items don't establish that Schendorf lived in the apartment, a juror could reasonably infer that he exercised dominion and control over the office and exclusively possessed it because his personal property was kept there.

¶ 19    Even if Schendorf didn't have exclusive possession of the office, there was sufficient evidence for the jury to reasonably infer that he knew methamphetamine was present because there were

other circumstances that buttressed the inference and linked him to the drugs found therein. First, when detectives executed the search warrant, none of the other six individuals were in the office, and detectives testified that they didn't find anyone else's personal property in the office — only Schendorf's. *Cf. People v. Steed*, 540 P.2d 323, 327 (Colo. 1975) (holding that the defendant was entitled to judgment of acquittal where methamphetamine was found in a living room among nine people with nothing to link the possession to the defendant, who was not one of the nine). Second, in addition to methamphetamine, detectives found scales, small bags, and a scoop in plain sight once they opened the locked office door. Third, while it's possible that other occupants of the apartment may have also knowingly possessed the methamphetamine, that wouldn't preclude the jury from finding that Schendorf knowingly possessed the methamphetamine. *See People v. Wilkie*, 522 P.2d 727, 729 (Colo. 1974) (recognizing that sole and exclusive possession is not required and that joint possession in a place at least partially under the dominion and control of the accused is sufficient).

¶ 20     Viewing these circumstances together and giving the prosecution the benefit of every favorable inference, even if

Schendorf's possession wasn't exclusive, because he had dominion and control over the locked office, which, in addition to drugs and paraphernalia, contained his personal property, the jury could reasonably have inferred that he knowingly possessed methamphetamine.

### 4.    Intent to Distribute

¶ 21    Schendorf contends that the prosecution failed to prove beyond a reasonable doubt that he knowingly possessed methamphetamine "with intent to distribute" because only one pound of the substance found in the apartment was forensically tested and confirmed as methamphetamine.  Without testing the other nine pounds of evidence, he says, there was insufficient proof that the remaining substances weren't something else.  Schendorf asserts that, without definitive testing, the only other evidence of intent to distribute was based on Gomez's "speculative" opinion that ten pounds of methamphetamine was consistent with distribution levels rather than personal use.  We aren't persuaded.

### a.    Applicable Law

¶ 22    As mentioned above, we review de novo whether there was sufficient evidence to support a conviction.  *Price,* ¶ 16.  "Intent can

11

rarely be proven other than through circumstantial or indirect evidence." *People v. Sena*, 2016 COA 161, ¶ 16.

### b.    Analysis

¶ 23    First, intent to distribute may be proved through evidence of scales, small bags, and larger amounts of controlled substances that are separately packaged.  *See, e.g.*, *People v. Munoz-Casteneda*, 2012 COA 109, ¶ 35 (evidence of digital scales, stacks of cash, and approximately two ounces of cocaine divided into smaller amounts and packaged in separate bags was sufficient proof of the defendant's intent to distribute); *People v. Atencio*, 140 P.3d 73, 76 (Colo. App. 2005) (large amount of cocaine that was separately packaged constituted sufficient proof of the defendant's intent to distribute).  Gomez testified that he saw scales, a scooper, and micro baggies in the office, which are all items consistent with distribution rather than personal use.  He also testified that "a little over [ten] pounds" of methamphetamine was recovered from the apartment, and based on his training and experience, that amount of methamphetamine was "distribution level" and not for personal use.  Based on Gomez's testimony alone, there was sufficient

circumstantial evidence for the jury to find that Schendorf intended to distribute methamphetamine.

¶ 24 Second, Collins testified that she only tested one of the packages containing suspected methamphetamine, which weighed 453.25 grams. When asked why she didn't test the other packages recovered from the office, Collins explained that because the bag she tested was already over 112 grams — the requisite statutory amount for a level one drug felony — it was unnecessary for her to continue testing. Such an amount of methamphetamine suggests intended distribution rather than personal use. As Gomez testified, a user consumes about one to four grams per day, and a typical user wouldn't have that much methamphetamine in their possession.

¶ 25 Giving every favorable inference to the prosecution, the amount of methamphetamine found, coupled with the presence of scales, a scoop, and micro baggies in the office, was sufficient for a reasonable juror to conclude that Schendorf intended to distribute methamphetamine.

## B. Motion to Suppress Evidence

¶ 26 Schendorf contends that the trial court erred by not suppressing the evidence recovered from the search because (1) the warrant lacked particularity and allowed for an overbroad and general search; (2) the court improperly applied the severability doctrine; and (3) the court improperly applied the good faith exception. We disagree with Schendorf's contentions.

### 1. Applicable Facts

¶ 27 Both the search warrant and affidavit were provided to the issuing judge. Gomez testified that, when officers executed the search, he had the warrant and affidavit with him. Schendorf did not review the warrant.

¶ 28 The warrant allowed search and seizure of "[p]ersonal property tending to establish the identity of the persons in control of contraband related paraphernalia consisting in part and including but not limited to DNA evidence, rent receipts, mail envelopes, photographs, keys, and U.S. currency." The warrant gave both the physical address and a physical description of the apartment to be searched. It specified that "the search is to include, but is not limited to, rooms, closets, cabinets, boxes, furniture, clothes,

14

containers, any crawlspaces, or storage area connected to, and all vehicles, structures, located on the curtilage thereof and upon person or persons within the above described structure." The warrant also directed officers to "search forthwith the place, person or vehicle above described for said property, and the said property and every part thereof to take, remove and seize."

¶ 29 The warrant incorporated the affidavit by reference. The affidavit, which Gomez prepared, indicated that probable cause for the search was based on a confidential informant's controlled purchases of substances inside the apartment that had field tested positive for methamphetamine. The affidavit described the search's objective as "[m]ethamphetamine and its salts and isomers, the salts of methamphetamine, isomers, vessels, implements and furniture used in connection with the manufacture, production, storage and dispensing of methamphetamine and related illegal drugs."

¶ 30 Before trial, Schendorf moved to suppress all the evidence obtained through the search warrant. Schendorf argued that the warrant was deficient on its face because it didn't include information that detectives were looking for methamphetamine.

15

Rather, the warrant only authorized seizure of (1) personal property tending to establish the identity of the persons in control of the controlled substances; (2) related paraphernalia; and (3) U.S. currency. The court held a hearing at which defense counsel challenged the use of the catchall phrase "but is not limited to" because it made the warrant overly broad and improperly extended the areas to be searched beyond the apartment.

¶ 31 The court agreed that the warrant was overly broad. Specifically, the phrases "including but not limited to," "to include, but is not limited to," and "to search forthwith the place, person or vehicle above described for said property, and the said property and every part thereof" permitted a general exploratory search. While these phrases authorized a general search, the language immediately following identified specific areas and items subject to the search. The court found that the warrant incorporated the affidavit by reference, and it concluded that the warrant's deficiencies could be cured through severance. Accordingly, the court found "a good-faith basis" (1) to sever the phrases "included but not limited to" and "every part thereof" and (2) to permit a search of the "rooms, closets, cabinets, boxes, furniture, clothes,

16

containers, any crawlspaces, or storage area connected to." The court determined that with the excisions, the warrant was not overly broad and because the search warrant incorporated the affidavit by reference, evidence of methamphetamine found within the permitted areas was also admissible.

### 2.     Standard of Review and Applicable Law

¶ 32     Our review of a motion to suppress presents a mixed question of fact and law. *People v. Thompson*, 2021 CO 15, ¶ 15. We accept the factual findings of the trial court if they are supported by competent evidence but assess their legal significance de novo. *Id.* Our review of a ruling on a motion to suppress is limited to the record created at the suppression hearing. *People v. Dacus*, 2024 CO 51, ¶ 24. We review de novo whether a search warrant may be severed and whether the good faith exception applies. *United States v. Sells*, 463 F.3d 1148, 1153 (10th Cir. 2006).

¶ 33     A warrant that is not sufficiently particular is invalid, "and evidence discovered pursuant to an invalid warrant, with some limited exceptions, cannot be introduced in court." *Dhyne v. People*, 2024 CO 45, ¶ 10. "Blanket suppression is an extraordinary remedy that should be used only when the violations

17

of search warrant requirements are so extreme that the search is essentially transformed into an impermissible general search." *People v. Eirish*, 165 P.3d 848, 856 (Colo. App. 2007).

### 3. Particularity

¶ 34 Schendorf first argues that the warrant was overbroad and lacked particularity because it didn't authorize detectives to search for and to seize methamphetamine, and it didn't limit the items to be seized or the places to be searched.

### a. Applicable Law

¶ 35 The Fourth Amendment of the United States Constitution requires a warrant to describe with particularity the places to be searched and the items to be seized. *People v. Staton*, 924 P.2d 127, 131 (Colo. 1996) (citing U.S. Const. amend. IV). This requirement precludes general searches, which are prohibited. *Thompson*, ¶ 18. The standard for particularity is "whether the description in a warrant is sufficiently particular that it enables the executing officer to reasonably ascertain and identify the things authorized to be seized." *People v. Roccaforte*, 919 P.2d 799, 803 (Colo. 1996). "[T]he particularity of an affidavit can cure an overbroad warrant." *Id.* at 804. However, for the affidavit to satisfy

the particularity requirement, (1) the warrant must incorporate the affidavit by reference; (2) the affidavit and warrant must both be presented to the issuing judge or magistrate; and (3) both documents must be present during the execution of the search warrant. *Staton*, 924 P.2d at 132.

### b. Analysis

¶ 36 Schendorf first argues that the warrant didn't include methamphetamine and only included one category of evidence to be seized — personal property tending to establish the identity of the persons in control of contraband related paraphernalia — which wasn't evidence of any criminal activity. Although the warrant didn't specifically list methamphetamine as an item to be seized, the warrant incorporated the affidavit — which did specify methamphetamine — by reference and both documents were present when the judge signed the warrant and during the search. Accordingly, the warrant and affidavit together met the particularity requirements. *Cf. Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (holding a warrant invalid that did not describe "*at all*" the items to be seized and did not incorporate by reference the affidavit that

provided detailed description of the items, and the affidavit was similarly not present at the search).

¶ 37 Schendorf further alleges that the warrant and affidavit were not presented to him, but he doesn't provide authority indicating he must have been presented with these documents. Because Schendorf doesn't develop this argument, we will not address it further. *See People v. Liggett,* 2021 COA 51, ¶ 53 (acknowledging that we do not address undeveloped arguments), *aff'd,* 2023 CO 22. Recall that the particularity requirement is met if both the warrant and supporting affidavit are presented to the issuing judge and the warrant and affidavit are present during the search's execution or the affiant supervises the search. *See Staton,* 924 P.2d at 132. Here, Gomez took both the warrant and the affidavit to execute the search, and Gomez was the affiant and supervised the search.

¶ 38 Schendorf also argues that the warrant didn't limit the items seized or places searched to a particular crime. We aren't persuaded. The affidavit listed the type of property to be seized — methamphetamine, related paraphernalia, and indicia of ownership. The warrant referenced personal property similar to the property listed in the affidavit. These descriptions provided enough

particularity to adequately describe evidence related to suspected methamphetamine distribution. *Cf. Cassady v. Goering*, 567 F.3d 628, 635 (10th Cir. 2009) ("The officers only had probable cause to search for evidence related to marijuana cultivation, yet the warrant authorized the seizure of *all* possible evidence of *any* crime in *any* jurisdiction.").

¶ 39 Accordingly, the court properly concluded that the warrant incorporated the affidavit by reference and that the items and locations cited in the warrant and affidavit were described with sufficient particularity.

### 4. Severance

¶ 40 Schendorf argues that the trial court improperly applied the severance doctrine. Rather than conducting a multi-step analysis and determining which portions of the warrant were sufficiently particularized and valid, the court simply severed the catchall phrases. Schendorf also argues that even if the court properly applied the doctrine, the warrant had so many invalid portions that it was entirely "contaminated" and defective. We disagree with both contentions.

21

### a. Applicable Law

¶ 41    It's possible to sever deficient portions of a search warrant without invalidating the entire warrant. *Eirish*, 165 P.3d at 855. Severance applies where the valid portions of a warrant are particularized and distinguishable from the invalid portions. *Sells*, 463 F.3d at 1155. Under the severance doctrine, suppression of evidence is only necessary when evidence is seized pursuant to the invalid parts of the warrant. *Id.* at 1161.

¶ 42    To implement the doctrine, the court first divides the warrant into "phrases, clauses, paragraphs, or categories of items" and determines whether that "part of the warrant describes with sufficient particularity [the] items to be seized for which there is probable cause." *Id.* at 1155-56. Next, the court distinguishes the valid portions of the warrant from the invalid portions and "employ[s] a holistic test that examines the qualitative as well as the quantitative aspects of the valid portions of the warrant relative to the invalid portions to determine whether the valid portions 'make up the greater part of the warrant.'" *Id.* at 1160 (quoting *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993)). Any evidence

seized under the invalid portions of the warrant must be suppressed. *Id.* at 1161.

b. Analysis

¶ 43 Schendorf relies on *Sells* to argue that the court needed to divide the warrant into sections and to isolate the categories of items to be seized to prevent exploratory rummaging and then it had to separate the valid portions of the warrant from the invalid portions. In *Sells*, the court determined that the warrant could be divided up by commas to allow officers to search for five categories of evidence, including specific firearms, footwear, and clothing. *Id.* at 1156. Here, the court severed the phrase "including, but not limited to" twice — the first time to limit the search to particularized items ("DNA evidence, rent receipts, mail envelopes, photographs, keys, and U.S. currency") and the second time to limit the search to particularized areas ("rooms, closets, cabinets, boxes, furniture, clothes, containers, any crawlspaces, or storage area").

¶ 44 While the court didn't divide the warrant into sections and then split the evidence into categories, removing the problematic language had the same effect because the places to be searched and items to be seized are sufficiently particular. And the valid portions

23

make up the greater portion of the warrant both in quantity and quality.

¶ 45    Lastly, the trial court distinguished the valid parts of the warrant from the invalid parts and suppressed evidence recovered from the invalid portions, including evidence found on the curtilage of the apartment complex and "videotapes, computer data recordings and photographic material."[1]

¶ 46    Accordingly, the court didn't err by denying the motion to suppress.

## C.    Testimonial Errors

¶ 47    Schendorf contends that (1) the court erred by accepting Gomez as an expert witness; (2) Gomez's statements usurped the function of the jury; (3) the trial court erred by permitting Detective Tom Thwaits to provide expert testimony under the guise of lay

---

[1] Although the court mentioned that it found a "good faith" basis to sever the "but not limited to" language, it didn't apply the good faith exception — only the severance doctrine.  Good faith is its own exception and applies when a court finds that a warrant is invalid. *See People v. Cooper*, 2016 CO 73, ¶ 10.  To the extent that Schendorf challenges the court's use of the good faith exception, because the court didn't use it — other than to find that no good faith exception applied to the invalid language "videotapes, computer data recordings and photographic material" for which evidence was suppressed — we will not address it.

testimony; and (4) Officer Dean Moretti's testimony regarding the execution of the search warrant was improper. We disagree with each contention.

### 1. Gomez's Expert Testimony

¶ 48 Schendorf argues that Gomez was unqualified to give expert testimony because it lacked reliability and wasn't based in science.

### a. Standard of Review and Applicable Law

¶ 49 Trial courts have broad discretion to determine the admissibility of expert testimony. *People v. Ramirez*, 155 P.3d 371, 380 (Colo. 2007). We review a trial court's decision to admit expert testimony for an abuse of discretion and only reverse when the decision is manifestly erroneous. *People v. Cooper*, 2021 CO 69, ¶ 44. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or it misapplies the law. *People v. Grant*, 2021 COA 53, ¶ 12.

¶ 50 CRE 702 and CRE 403 govern the admissibility of expert testimony. *Kutzly v. People*, 2019 CO 55, ¶ 10. Under CRE 702, a witness qualified as an expert because of knowledge, skill, experience, training, or education may provide opinion testimony if "scientific, technical, or other specialized knowledge will assist the

25

trier of fact to understand the evidence or to determine a fact in issue." CRE 702 "requires a 'broad' and 'liberal' inquiry into the admissibility of expert testimony." *Golob v. People*, 180 P.3d 1006, 1011 (Colo. 2008) (quoting *People v. Shreck*, 22 P.3d 68, 77-78 (Colo. 2001)). Relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." CRE 403.

¶ 51 In determining whether expert testimony is admissible, courts employ a *Shreck* analysis, looking to whether "(1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury; and (4) the evidence satisfies CRE 403." *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011). A court is required to issue specific findings when it makes a determination of relevance and reliability under CRE 702. *Id.*

¶ 52 When specialized knowledge is based on experience, we determine whether the evidence is reasonably reliable and whether it will assist the trier of fact. *People v. Douglas*, 2015 COA 155, ¶ 61. We therefore focus on "(1) whether the testimony would be useful to the jury and (2) whether the witness is qualified to render

an opinion on the subject." *Id.* An expert's testimony is useful to the jury if it assists the trier of fact to understand other evidence or determine an issue of fact. *Id.* at ¶ 62. Usefulness of an expert's testimony depends on whether a logical relation exists between the testimony and the facts. *Id.* The qualification standard is liberal, but an expert witness must be able to provide an explanation of his qualifications. *Id.*

### b.     Additional Facts

¶ 53     The prosecution filed a notice to endorse Gomez as an expert in narcotics trafficking and distribution. Defense counsel moved to strike Gomez's anticipated testimony and requested a *Shreck* hearing, which the court held. Defense counsel argued that there was no reliable basis for Gomez's testimony and that his testimony would be anecdotal and not based on any reliable science. Defense counsel also challenged Gomez as an expert based on his credentials, asserting that he had completed only one basic narcotics investigation course two years previously, a laboratory certification in 2020, and no other narcotics-specific certifications or training.

¶ 54    The court found that Gomez had over twenty-one years of experience in law enforcement and had been assigned to the drug task force for three years, and that his curriculum vitae indicated that he "secures intelligence information, gathers evidence, effects arrests, writes and executes search warrants and testifies in criminal proceedings related to narcotics." The court also found that he "handle[d] confidential informants" and was "a [methamphetamine] lab team member . . . in identifying, investigating and dismantling methamphetamine labs," and that he took several courses, including courses in basic narcotics and undercover investigations. He also held a clandestine laboratory certification and Peace Officer Standards and Training certifications.

¶ 55    The court concluded that Gomez had knowledge, skill, and experience beyond what would be expected of a layperson and that his testimony would be useful to the jury in explaining the "logical relevance between the opinion that . . . Gomez is going to offer and the issues in the case at hand given the charges." Having concluded that the prosecution met its burden under *Shreck,* the

court denied defense counsel's motion.  Defense counsel renewed her objection at trial, but the court declined to reconsider its ruling.

### c.     Analysis

¶ 56     Schendorf contends that the trial court improperly admitted Gomez's expert testimony because it was unreliable, not based on scientific or technical knowledge as required by CRE 702, and anecdotal.  We disagree for several reasons.

¶ 57     First, Gomez was qualified to opine on matters of drug distribution and trafficking; he had over twenty years of experience in law enforcement — as a detective and a patrol officer — during which he received structured training through courses and experience-based training.

¶ 58     Second, Gomez's testimony was reasonably reliable.  Although his testimony wasn't based on scientific principles, it was based on technical knowledge, which he amassed over his experience in the field and "hundreds, if not thousands," of interviews of "victims, witnesses, [and] suspects in jail."  *See, e.g.*, *People v. Perkins*, 2023 COA 38, ¶ 48 (testimony of fire investigator regarding the origin of an explosion was admissible under CRE 702 because it was based

on professional experience, deductive reasoning, and technical knowledge).

¶ 59     Third, Gomez's testimony was useful for the jury because, as the trial court pointed out, "amounts and personal use of methamphetamine or indicia of distribution" wouldn't be "within the ambit of [a] layperson's knowledge." Gomez's testimony would help the jury understand the evidence.

¶ 60     Finally, Gomez's testimony was relevant to the case.

¶ 61     Accordingly, the trial court didn't abuse its discretion by allowing Gomez to testify as an expert witness on narcotics distribution and trafficking.

### 2.     Usurping the Jury's Role

¶ 62     Schendorf contends that the trial court erred by allowing Gomez to opine that the amount of methamphetamine found was consistent with distribution because the jury was responsible for determining whether Schendorf had the intent to distribute methamphetamine. We disagree.

### a.     Additional Facts

¶ 63     The prosecutor asked Gomez how much methamphetamine a typical user consumes in a day. Gomez testified that a typical user

"won't use more than [one] to [four] grams. . . . No more than [four]. On average, probably [one] to [two] grams." Regarding the amount of methamphetamine found, the prosecutor asked Gomez whether the amount was "personal use, or is that more distribution-level methamphetamine?" Gomez responded, "Distribution-level methamphetamine." When asked why, Gomez said,

> Well, there's [ten] pounds of — a little over [ten] pounds there. If it was a user amount and he did, let's just say, [four] grams, just to make the math easy, [four] times [seven] is [twenty-eight] grams. [Twenty-eight] times, you know — there's [sixteen] ounces. Well, [twenty-eight] grams is an ounce, and there's [sixteen] ounces in a pound, so that's [sixteen] weeks' worth of usage for somebody who was using [four] grams. We're just throwing that number out there. So he's got 16 weeks with a — per pound, and it's 10 pounds in there, so 160 weeks. So he can, or whoever — it's over three years' worth of non-stop doing [methamphetamine] every day for over three years.

Gomez testified that it was uncommon for a methamphetamine user to have ten pounds of the drug. Defense counsel didn't object during this questioning.

¶ 64    On cross-examination, defense counsel had the following exchange with Gomez:

[Defense counsel]: [Y]ou indicated in your report that large quantities can be consistent with distribution?

[Gomez]: Yes.

[Defense counsel]: But also that small quantities can be consistent with distribution?

[Gomez]: Yes.

. . . .

[Defense counsel]: You also indicated that as to the quantity of methamphetamine found in this case, typically your typical user wouldn't carry it around with them due to the value?

[Gomez]: Yes.

[Defense counsel]: Okay. And you have noted in your report that the quantities found could also, in addition, be consistent with potential personal use?

[Gomez]: Small amounts, yeah, but not [ten] pounds.

¶ 65    Gomez also said, "I don't see somebody buying [ten] pounds of methamphetamine for personal use." Gomez again testified on redirect that ten pounds is typically for distribution or selling to others. Again, defense counsel didn't object.

b. Standard of Review and Applicable Law

¶ 66    As mentioned, we review a trial court's admission of expert testimony for abuse of discretion. *People in Interest of J.R.*, 2021 COA 81, ¶ 16. "An expert may . . . offer testimony that embraces an ultimate issue to be decided by the trier of fact." *Rector*, 248 P.3d at 1203. In determining whether an expert's testimony usurped the jury's role, we consider various factors including, but not limited to,

> whether (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion of the applicable law or legal standards and thereby usurped the function of the court; (3) the jury was properly instructed on the law and that it could accept or reject the expert's opinion; and (4) the expert opined that the defendant had committed the crime or that there was a particular likelihood that the defendant did so.

*People v. Baker*, 2021 CO 29, ¶ 32.

c. Analysis

¶ 67    Gomez's testimony didn't usurp the jury's role. Although Gomez testified that the amount of methamphetamine found in the office was consistent with distribution, he didn't testify that Schendorf *intended* to distribute methamphetamine. *See Atencio*, 140 P.3d at 76 (sergeant's opinion "that four ounces of a controlled

33

substance was an amount consistent with distribution, rather than with personal use" didn't invade the jury's province because the sergeant didn't testify that the defendant possessed the intent to distribute). Also, Gomez didn't express an opinion on the applicable law or legal standards. He didn't testify that Schendorf was guilty or had committed any crimes, nor did he opine on elements necessary for a conviction. Finally, the court instructed the jury that it could accept or reject any witness testimony and that the weight to give to expert testimony was entirely its decision.

### 3. Thwaits's Testimony on Controlled Substances

¶ 68 Schendorf contends that the trial court erred by admitting Thwaits's testimony because he provided expert testimony but wasn't endorsed as an expert.

#### a. Additional Facts

¶ 69 Thwaits assisted with the search warrant's execution and searched the office. He testified that he found "several baggies and scales on top of the desk, some bags with white shards which I know to be, in my professional opinion, to be —" Defense counsel then objected on grounds of foundation and improper testimony

under CRE 702. The court sustained the objection and told the prosecutor to lay foundation.

¶ 70    During his testimony, Thwaits identified multiple substances as narcotics based on his training and experience. Thwaits testified that he is often assigned to cases involving controlled substances and identifies controlled substances as part of those investigations. Defense counsel objected to each identification, and the court told the prosecutor to lay foundation.

¶ 71    The court ultimately overruled defense counsel's objections, finding that the prosecutor had laid adequate foundation and the questions were appropriate under the case law and rules.

¶ 72    Later, defense counsel renewed her objection, arguing that Thwaits's testimony was based on his training and experience but that he hadn't been endorsed as an expert. In response, the court found,

> Regarding the expertise, I agree, I think under *Atencio* and *Venalonzo*[ *v. People*, 2017 CO 9], this detective has provided expert testimony here. Clearly, recognizing methamphetamine or any other controlled substance provides some – would require some level of expertise beyond what we would expect from a layperson. That said, I can't find that there's prejudice here, that the charges articulate that

methamphetamine is an issue, controlled substances are an issue. It was brought up during opening statements. So the fact that he wasn't endorsed I can't find is — that the defense was somehow caught off guard that this was methamphetamine. The only thing I will say, though, is that the People better get a chemist in here who is going to testify that that's what that is.

b. Applicable Law and Standard of Review

¶ 73    We review a trial court's evidentiary decisions for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). Whether the trial court abused its discretion here turns on whether the testimony of the officer was improper lay testimony. *Id.*

¶ 74    Because CRE 701 prohibits lay testimony based on specialized knowledge, "a police officer's testimony must be based on experience common to ordinary citizens, not experience unique to the witness's role as a police officer." *Douglas*, ¶ 38. Where an officer's testimony is based on his specialized training or education, and not only his perceptions, the officer must be qualified as an expert to offer what amounts to expert testimony. *Stewart*, 55 P.3d at 124.

¶ 75    We review preserved claims of error under the harmless error standard. *Hagos v. People*, 2012 CO 63, ¶ 12. Reversal is required

36

under that standard only where the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting *Tevlin v. People,* 715 P.2d 338, 342 (Colo. 1986)).

### c. Analysis

¶ 76 The trial court found — and we agree — that Thwaits offered expert testimony. The basis for Thwaits's testimony was his experience, and he could not have identified the substances without that specialized experience and training as an officer. *See Venalonzo,* ¶ 22 ("[I]t is the nature of the experiences that could form the opinion's basis that determines whether the testimony is lay or expert opinion."). Instead of prohibiting Thwaits's testimony, however, the court abused its discretion by permitting expert testimony under the guise of lay witness testimony.

¶ 77 But the court's error was harmless because it didn't substantially influence the verdict or the fairness of the trial proceedings, for a few reasons.

¶ 78 First, Thwaits's testimony concerning the substances found in the office was consistent with testimony by Gomez, who was properly endorsed as an expert and testified that the white substance appeared to be methamphetamine. *See People v. Quillen,*

2023 COA 22M, ¶ 24 (admitting portions of a letter was harmless because evidence was cumulative of a detective's proper testimony about the same information).

¶ 79 Second, Collins testified that the substances collected from the office tested positive for methamphetamine, fentanyl, and MDA.

¶ 80 Third, defense counsel couldn't have been surprised by Thwaits's testimony that the collected substance was likely methamphetamine because the charging documents allege that Schendorf "knowingly possessed with intent to sell or distribute [m]ethamphetamine" and that the prosecution would offer testimony to prove that charge.

### 4. Moretti's Testimony on Search Warrant Execution

¶ 81 Schendorf contends that Moretti's testimony explaining the SWAT team's role in executing search warrants was improper because (1) it was irrelevant to whether Schendorf knowingly possessed and intended to distribute a controlled substance; (2) it referenced a screening process; and (3) it was more prejudicial than probative since it suggested that Schendorf was a known criminal to police. We disagree.

### a.    Additional Facts

¶ 82    Moretti — a member of the SWAT team — described the

process for executing a search warrant:

> We get contacted by the jurisdiction of
> investigators/detectives that would like to
> serve the warrant.  We run it through a SWAT
> matrix is what we refer to it as, see if it is high
> risk.  If they request a warrant based on the
> risk level, then we will serve it.  Before we
> serve a warrant, we'll scout a location, and
> then we'll have a tactical briefing as well as an
> investigation briefing.

Moretti testified that, after the SWAT team arrives at the property to

be searched, officers give the occupants "loud verbal commands

and announcements," and if the occupants ignore those commands,

the SWAT team will "breach the door with a large metal ram."

Schendorf's counsel didn't object to Moretti's testimony.

### b.    Applicable Law and Standard of Review

¶ 83    Evidence is relevant if it has "any tendency to make the

existence of any fact that is of consequence to the determination of

the action more probable or less probable than it would be without

the evidence."  CRE 401.  "[I]n some circumstances, police officers

may testify about the reasons they took certain investigative steps,

39

even where this testimony touches upon prohibited subjects." *People v. Penn*, 2016 CO 32, ¶ 32.

¶ 84 Because Schendorf's attorney didn't object to Moretti's testimony, any error was unpreserved, and we review for plain error. *See People v. Van Meter*, 2018 COA 13, ¶ 26. "Plain error is [error that is] obvious and substantial," *Hagos*, ¶ 14, and that "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction," *Thompson v. People*, 2020 CO 72, ¶ 54. An error is obvious if it contravened well-settled legal principles, clear statutory commands, or Colorado case law. *Id.* The error must be one that a judge should be able to avoid without an objection. *People v. Ujaama*, 2012 COA 36, ¶ 42.

c.    Analysis

¶ 85 Schendorf first argues Moretti's testimony shouldn't have been admitted because it was irrelevant to the charges. We are unpersuaded. Moretti's testimony related to the investigation and the warrant's execution, which provided information about who breached the locked room before it was searched, how many individuals were in the building, and other investigative decisions.

While this testimony may have suggested the SWAT team was requested by detectives, the probative nature of the above information was not outweighed by the danger of any unfair prejudice.

¶ 86    Next, Schendorf argues that Moretti's reference to a "SWAT matrix" was improper because it referenced a "screening process" that hinted at Schendorf's guilt or implied that he was a criminal. In support, Schendorf cites *People v. Mendenhall*, 2015 COA 107M, ¶ 62. In *Mendenhall*, an investigative officer testified why, based on his experience with how many potential cases he received annually and how many cases resulted in criminal charges, he decided to recommend charges against the defendant. *Id.* The court determined that the statement improperly implied that the defendant was guilty because the prosecution thought it was "appropriate" to bring criminal charges in his case but not others. *Id.* at ¶ 63. But Moretti's statement about a SWAT matrix was unlike the investigative officer's statement in *Mendenhall*. Moretti didn't discuss a process to bring criminal charges, nor did he discuss what made the warrant "high risk" or imply that Schendorf was known to police. Because Moretti's statement about a SWAT

matrix didn't imply that there was additional evidence supporting Schendorf's guilt, there was no error in admitting his testimony.

¶ 87 Even if the testimony had been improper, its admission didn't amount to plain error because any error was not obvious and didn't undermine the fundamental fairness of the trial. Moretti's statements did not discuss the process leading to Schendorf's charge or the decision to charge Schendorf. Moretti simply described the process of executing a warrant and that process as applied to the apartment. *See People v. Walker*, 2022 COA 15, ¶ 36 (finding no plain error where the comment didn't mention a screening process). Additionally, Moretti's reference to the SWAT matrix was in a brief portion of his testimony, and the matrix wasn't mentioned again during trial or closing.

## D. Cumulative Error

¶ 88 Schendorf contends that a new trial is required because numerous errors in the aggregate deprived him of a fair trial. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. The cumulative error doctrine

thus requires that multiple errors occurred. *People v. Daley*, 2021 COA 85, ¶ 141. Because we haven't identified multiple errors, the cumulative error doctrine doesn't apply.

### III. Disposition

We affirm.

JUDGE J. JONES and JUDGE LUM concur.